789 F.2d 196
 UNITED STATES of America
v.
SMITH, William T., Jr.
Appeal of William T. SMITH, in 85-5532 and 85-5714.
UNITED STATES of America
v.
STONEMAN, Alan R.
Appeal of Alan R. STONEMAN, in 85-5702.
 Nos. 85-5532, 85-5702 and 85-5714.
 United States Court of Appeals,
Third Circuit.
 Argued March 18, 1986.
Decided April 28, 1986.
Rehearing and Rehearing In Banc
Denied May 23, 1986.
 
 James J. West, U.S. Atty. (argued), David C. Shipman, Asst. U.S. Atty., Harrisburg, Pa., for U.S.
 John Rogers Carroll (argued), Carroll & Carroll, Philadelphia, Pa., for William T. Smith, Jr.
 John Brown (argued), Christian Menard, Brown & Martinez, Oxnard, Cal., for Alan R. Stoneman.
 Before HUNTER and MANSMANN, Circuit Judges, and POLLAK,* District Judge.OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 
 I. INTRODUCTION
 
 1
 XET, Ltd. d/b/a CTA, Ltd., Computer Technology Associates, Inc., John R. Torquato, Jr., William T. Smith, Alan R. Stoneman, Judy Ellis, and David Herbert were charged in a thirty-nine count indictment with conspiracy, 18 U.S.C. Sec. 371 (1982), fifteen violations of the Interstate Transportation and Aid of Racketeering ("I.T.A.R." or "Travel Act") statute, 18 U.S.C. Sec. 1952(a)(3) (1982) and the mail fraud statute, 18 U.S.C. Sec. 1341 (1982). The indictment outlined a conspiracy involving fifty-one overt acts, seven mail fraud violations, and nine I.T.A.R. violations.
 
 
 2
 The conspiracy count alleged that the defendants sought to obtain Federal Insurance Contribution Act ("FICA") recovery contracts[1] from state and local entities, not by placing bids, but by bribing public officials with cash, stock, stock options, campaign contributions, employment, and paid travel. The defendants directed their efforts at obtaining the contracts for Allegheny County, the City of Pittsburgh, and the Pennsylvania school employees. The indictment alleged that the conspiracy existed from January 1983 until October 22, 1984.
 
 
 3
 Torquato, Ellis, and Herbert entered guilty pleas to various counts. Smith and Stoneman pleaded not guilty to all counts. Their trial began on March 26, 1985 and was completed on June 24, 1985. At trial, the government called twenty-two witnesses against Smith and Stoneman, including their principal witness, Torquato, to support the government's allegations that Smith had offered a total of $400,000 in bribes to the Treasurer and Attorney General of Pennsylvania and that Stoneman had participated in the bribery scheme. The defendants called eighty-eight witnesses including many public officials who had dealt with Torquato on the FICA recovery contracts.
 
 
 4
 The jury found Smith guilty of conspiracy, four counts of mail fraud and four I.T.A.R. counts. Stoneman was found guilty only of conspiracy. The court sentenced Smith, who could have received up to two million dollars from the scheme, to a twelve-year prison term and a $63,000 fine. Stoneman was sentenced to a prison term of four months and fined $10,000. The government presented no evidence that Stoneman was to receive any payment other than his usual attorney fees.
 
 II. EVIDENCE PRESENTED
 
 5
 In early 1983, Smith and Torquato met to discuss how to obtain Pennsylvania state contracts to recover overpaid Social Security taxes. The two had been friends and business associates for over twenty years. Torquato is the son of a former Democratic County Chairman of Cambria County. Smith was then the Republican Chairman of Dauphin County. They agreed to make political contributions to officials in a position to award the contracts. Torquato introduced Smith to David I. Herbert, the State Director for Social Security, who controlled FICA recovery for Pennsylvania's public employees. The three men discussed other political subdivisions where they might obtain contracts. From January 1983 to October 1984, Smith and Torquato concentrated on obtaining contracts for Allegheny County, the City of Pittsburgh, and Pennsylvania state employees.
 
 
 6
 CTA, Ltd. obtained and performed a contract for FICA recovery for Allegheny County. This company had been formed by Stoneman on November 29, 1982. Torquato sent a copy of the proposal to Smith for review and wrote to him about contracts in other areas. Torquato paid $852.00 for James Scanlon, head of Allegheny County Computer Services, to take a trip to New York with his family. Stoneman paid this bill on August 31, 1983. Scanlon recommended that CTA, Ltd. be given the contract over other companies giving lower bids. Stoneman executed the contract on behalf of CTA, Ltd.
 
 
 7
 Torquato offered Gene Scanlon, James Scanlon's brother, a number of benefits including a $50,000 a year job at CTA, Ltd. for Jim Scanlon, mailing lists for his daughter's business, use of a rented car, payment for an airline ticket, and finally $100,000 to set up a "widget factory" in Hong Kong. Allegheny County paid CTA, Ltd. for the contract in November 1983. The next month, Torquato sent Smith $1,000 for his services along with a letter discussing how to influence Herbert.
 
 
 8
 Stoneman set up a California corporation, Com-Max, Inc., on January 5, 1984, but did not file the corporate documents that would have identified the officers of the corporation and disclosed its connection to CTA, Ltd. He sent 1,500 shares of Com-Max, Inc. to Herbert on January 22, 1984 with a letter stating that the stock would be bought back in three years for at least $15,000. A similar letter plus 1,500 shares was sent to Scott O'Donnell, Chief Clerk of Allegheny County.
 
 
 9
 CTA, Ltd. also obtained a FICA recovery contract for the employees of Pittsburgh. The company was to be paid $150,000 even though another contractor, who eventually did the job for the city, had bid $35,000. In fact, after CTA, Ltd. obtained the contract, Torquato hired this bidder as a subcontractor to do the work for $35,000. Stoneman sent Robert Rade Stone, President of the Pittsburgh City Council, a $6,374.86 check drawn on Stoneman's own bank account and stock options for 35,000 shares of Com-Max stock. Stoneman also sent stock options for 25,000 shares to Richard Schmeiser, Director of Finance for the City of Pittsburgh. Some of the profits from the FICA contracts were to be used to make the Com-Max stock valuable and, therefore, to benefit the public officials who were given Com-Max stock and stock and options.
 
 
 10
 During 1983, the defendants tried to obtain the FICA recovery contract for all Pennsylvania state employees. Torquato and Smith wanted a fee of $8,000,000 for the job. In November 1983, however, they discovered that the contract was to be performed in-house at a cost of $300,000. To secure the contract, Smith and Torquato had visited the Republican State Chairman, Robert Asher, in July 1983 and offered him $500,000 from the contract for the Republican Party. They decided that, in order to obtain the FICA recovery contracts, they needed to have jurisdiction over the contracts moved from the governor to the State Treasurer, R. Budd Dwyer, a friend of Smith's. Smith met with Senate Minority Whip Eugene Scanlon, David Herbert, and Jim Scanlon to discuss legislation to accomplish the change. After the legislation passed, Torquato purchased $500 worth of tickets to House Majority Leader Jim Manderino's fund raiser.
 
 
 11
 Torquato and Smith met with the Treasurer of Pennsylvania on March 2, 1984, and discussed a $300,000 payment to be divided among the Treasurer, the Treasurer's reelection campaign, and the Republican State Committee. Herbert continued to aid Torquato and Smith and on May 10, 1984 the Treasurer awarded the Pennsylvania contract to the Pennsylvania company formed by Smith in April 1984, Computer Technology Associates, Inc. Herbert was to be given $100,000 in a Swiss bank account. The contract, awarded on a no-bid basis, would have generated $4,000,000 in profit, to be split between Smith and Torquato, at an expense to the Commonwealth of $6,000,000. The contract was ultimately performed by an accounting firm, Levin-Horwath, for $1,300,000 with a possibility of up to thirty-five percent being rebated.
 
 
 12
 To avoid any competition in collecting FICA overpayments, Smith attempted to obtain a ruling from the Attorney General of Pennsylvania, Leroy Zimmerman, that the contract was exclusive. Smith told Patrick Boyle, Press Secretary to the Attorney General, that Torquato would give $100,000 to the Attorney General's reelection campaign. The Attorney General ruled that the Treasurer's Counsel could decide the issue. The Treasurer's Counsel then ruled that the contract was exclusive.
 
 
 13
 When Smith and Torquato heard that their contract might be investigated, they were concerned that officials might discover that Com-Max was a holding company for CTA, Inc., the company handling the school employees contract. In June 1984, Smith formed a new corporation Application Softward Systems, Inc. (A.S.S.I.). The FBI searched Torquato's residence on July 6, 1984 and found records of payments to be made to various Pennsylvania officials. The defendants were indicted on October 22, 1984.
 
 
 14
 III. VARIANCE BETWEEN THE INDICTMENT AND THE PROOF
 
 
 15
 Smith and Stoneman claim that the conspiracy charged in the indictment impermissibly varied from the evidence at trial because the evidence proved multiple conspiracies. There are two possible ways in which the evidence at trial may vary from the indictment. First, an amendment may alter the terms of the indictment and, therefore, constitute a per se violation of the fifth amendment grand jury clause. See Stirone v. United States, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960); United States v. Castro, 776 F.2d 1118, 1121 (3d Cir.1985); United States v. Somers, 496 F.2d 723, 743 (3d Cir.), cert. denied, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). Second, a variance may exist if the evidence at trial proves facts different from those alleged in the indictment. The evil of a variance is that defendants may be deprived of notice of the charges against them and may be subject to double jeopardy. See Gaither v. United States, 413 F.2d 1061, 1071 (D.C.Cir.1969). Variances are not subject to the Stirone per se rule. They are examined on a case-by-case basis and constitute reversible error only if the defendant was prejudiced. See Castro, 776 F.2d at 1121; Somers, 496 F.2d at 743. The Supreme Court recently considered the variance issue in United States v. Miller, --- U.S. ----, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). The Miller Court acknowledged that, under Stirone, trial evidence could not amend the indictment by broadening the bases for conviction. However, the court recognized that an indictment may permissibly allege more crimes than are actually proven at trial. Id. at 1815.
 
 
 16
 In the case before us, the court below properly instructed the jury that it could find that there was one master conspiracy and more than one subsidiary scheme. See United States v. Kenny, 462 F.2d 1205, 1261 (3d Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 233, 234, 34 L.Ed.2d 176 (1972). When a single conspiracy is charged in the indictment, there is a variance if the evidence at trial proves only the existence of multiple conspiracies. See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Boyd, 595 F.2d 120, 123 (3d Cir.1978). However, a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies and, therefore, would not create an impermissible variance. The question of whether a single conspiracy or multiple conspiracies existed is a fact question to be decided by the jury. This court must sustain the jury's verdict if there is substantial evidence, viewed in the light most favorable to the government, to support the finding of a single master conspiracy with subsidiary schemes. See United States v. Brooks, 697 F.2d 517, 523 (3d Cir.1982), cert. denied, 460 U.S. 1071, 103 S.Ct. 1526, 75 L.Ed.2d 949 (1983). The evidence supported a finding of a single conspiracy which was formed with the goal of obtaining FICA recovery contracts through bribery and fraud. 619 F.Supp. 1441. The fact that the group sought more than one contract does not necessarily mean that there was more than one conspiracy.
 
 
 17
 The defendants contend that while the indictment charged one conspiracy, the evidence showed that three separate conspiracies existed: one to obtain the Allegheny County contract, one to obtain the Pittsburgh contract, and one to obtain the Pennsylvania employees contract. Smith claims that he was not part of the Allegheny contract or the Pittsburgh contract. He relies on United States v. Camiel, 689 F.2d 31 (3d Cir.1982), for his argument that a variance exists. In Camiel we found a prejudicial variance when an indictment charged a single scheme for creating no-work jobs on the government payroll, while the evidence at trial supported an inference of two or more conspiracies. The evidence could not support a reasonable inference of a single scheme because the alleged coparticipants were members of two antagonistic factions which would not work together. Camiel is clearly distinguishable from the case before us as there is no evidence of antagonistic groups. We find that the evidence presented does support the jury's finding of a single conspiracy.
 
 
 18
 Smith claims that his only possible involvement in the Allegheny or Pittsburgh schemes was in forming Application Software Systems, Inc. ("A.S.S.I."). He contends that since concealment of the crime after the object of the conspiracy has been attained is not part of the conspiracy, see Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); United States v. Pflaumer, 774 F.2d 1224, 1232 (3d Cir.1985), he cannot be placed in the Allegheny and Pittsburgh schemes. This argument fails since the evidence supports a finding of a single conspiracy and a finding that Smith was involved in all three schemes well before the formation of A.S.S.I. During and after the formation of A.S.S.I. the defendants continued to attempt to obtain FICA recovery contracts.
 
 
 19
 IV. SUPPLEMENTAL JURY INSTRUCTIONS ON MASTER CONSPIRACY
 
 
 20
 On June 13, 1985 the trial court instructed the jury on the conspiracy as follows:
 
 
 21
 The indictment alleges the existence of a conspiracy to commit mail fraud, and additionally, charges mail fraud itself. An essential element of both charges is that the Government must prove beyond a reasonable doubt the existence of a single scheme to defraud as charged in the indictment.
 
 
 22
 A Defendant may not be convicted unless he was a willing, knowing and active participant in the particular scheme to defraud alleged in this indictment.
 
 
 23
 Unless the jury finds beyond a reasonable doubt that the Government has proved the existence of a single scheme to defraud, as charged in the indictment, the Defendant must be acquitted of the pertinent counts. The single scheme charged includes the obtaining of FICA recovery contracts from Allegheny County, the City of Pittsburgh and also the Commonwealth of Pennsylvania.
 
 
 24
 If you find that Mr. Torquato and others were involved in separate conspiracies concerning or regarding Allegheny County or City of Pittsburgh, or Pennsylvania School District FICA recovery contracts, and that the Defendant was not a participant in one or more of these separate conspiracies, then your verdict as to the Defendant on the entire indictment must be not guilty.
 
 
 25
 By separate conspiracy, I mean a conspiracy that has no connection with another conspiracy except for the fact that John Torquato, Jr., or one or more other individuals, played a role in both conspiracies.
 
 
 26
 You may, however, find that the Defendant participated in the conspiracy charged in the indictment even if that conspiracy encompassed three related subconspiracies involving different groups of individuals.
 
 
 27
 Both Smith and Stoneman object to the following supplemental instructions given to the jury the next day on the issue of a master conspiracy with subsidiary schemes:
 
 
 28
 A single conspiracy is one in which the Defendants and those with whom they are charged with conspiring share a common goal of the conspiracy set forth in the indictment. Separate conspiracies, although they may have common elements, common participants, common means, some common objectives, or other common factors, but which lack the critical element of common objectives of the conspiracy on the part of all of the participants, do not qualify as a single conspiracy.
 
 
 29
 * * *
 
 
 30
 The gist of a criminal conspiracy may involve numerous transactions and the fact that conspirators individually or in groups perform different tasks in pursuing a common goal does not necessitate a finding of several conspiracies.
 
 
 31
 Even if a small group is at the heart of an unlawful agreement, others who knowingly participate with core members to achieve a common goal may be members of a single conspiracy.
 
 
 32
 Accordingly, you may find that a master conspiracy for the obtaining of FICA recovery contracts by a bribery and fraud existed and that more than one subsidiary scheme was involved. You should review the indictment and determine if the master conspiracy charged therein has been proven.
 
 
 33
 The defendants claim that these instructions lacked the "concrete accuracy" required of supplemental instructions. See Bollenbach v. United States, 326 U.S. 607, 613, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946). They contend that the jury's question concerning whether the defendants had to be involved in all three FICA recovery contracts if they were to be found guilty of conspiracy shows that instructions confused the jury. They further claim that the instructions on master conspiracy and subsidiary scheme presented a new theory of liability wholly different from the theory argued at trial. This alleged change in theory, they maintain, violated Federal Rule of Criminal Procedure 30[2] because defense counsel was not given notice of the instruction before closing argument. Material modifications of instructions will give rise to a violation of Rule 30 because the defendant is not given an opportunity to address the charge. Finally, the defendants argue that the instruction described an offense different than the one charged in the indictment and therefore created an impermissible variance under Kotteakos and Stirone.
 
 
 34
 We are unpersuaded by these arguments and find that the defendants were not prejudiced by the giving of the supplemental charge. We first note that the instruction given was a correct statement of the law. See United States v. Kenny, 462 F.2d 1205 (3d Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 333, 234, 34 L.Ed.2d 176 (1972). Moreover, the supplemental instruction on a master conspiracy and subsidiary scheme did not present a new theory of criminal liability and was not a material modification of the original instructions. The supplemental instruction was merely an elaboration of the earlier instruction. The instruction explained that a single conspiracy rather than multiple, unrelated conspiracies had to be found. However, the instruction also stated the single conspiracy could consist of a master conspiracy with one common objective but with several subsidiary schemes.
 
 
 35
 The defendants had notice of the multiple conspiracy issue. The issue was raised in the briefs for pretrial motions. At that time the government cited to Kenny. The defendants themselves had proposed supplemental instructions which addressed the need to find a single conspiracy. At the charge conference, the parties referred to the question of whether each FICA recovery contract was a subpart of the conspiracy. Indeed, it was defense counsel who requested a supplementary instruction on what constituted a separate conspiracy. The charge made it clear to the jury that a single conspiracy must have a common objective. The instruction on subsidiary schemes did not state a new theory and defense counsel had notice of the issue. There was, therefore, no violation of Rule 30.[3]
 
 
 36
 V. JURY INSTRUCTIONS ON THE TRAVEL ACT VIOLATIONS
 
 
 37
 Counts 11 to 16 of the indictment charged Smith with violations of the Travel Act, 18 U.S.C. Sec. 1952.[4] Smith was acquitted on Counts 11 and 16, which referred to Torquato's travel on January 24 and June 7, 1984. He was convicted, however, on Counts 12 through 15 which referred to Torquato's travel on February 27, March 19, April 17, and April 29, 1984.
 
 
 38
 The district court instructed the jury on the Travel Act violations as follows:
 
 
 39
 The term 'interstate commerce' means transportation or movement including the use of interstate telephone facilities and the movement of mail between one state and another state and while it must be proved that an individual used the facility of interstate commerce with the specific intent to promote, manage, establish or carry on an unlawful activity, it need not be proven that such purpose was the only reason promoting the facility of commerce to be used.
 
 
 40
 Smith claims that the jury should have been specifically instructed that there had to be an act of bribery subsequent to each trip by Torquato. Smith argues that the district court did not properly charge on the requirement that there be a sufficient nexus between the interstate travel and the unlawful activity. Smith claims that the district court erred in refusing to give a supplemental instruction stating:
 
 
 41
 There must be a connection between the travel and the subsequent act of bribery. It would not be enough, for example, for the government to prove that travel occurred on a particular occasion and at some subsequent time an act of bribery occurred unrelated to the travel. The travel may not be merely incidental to the unlawful activity. There must be a coincidence between the travel and the act of bribery in the sense that the purpose of the travel (or use of interstate facility) was to perform the act of bribery and, thereafter, an act of bribery was performed that was contemplated when the travel took place.
 
 
 42
 There is no requirement that the interstate travel forming the basis of a Travel Act violation be essential to the unlawful scheme. It need only make easier or facilitate the unlawful activity. See United States v. Perrin, 580 F.2d 730, 736 (5th Cir.1978), aff'd, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) (Travel Act violation based on act of telephoning map service out of state). However, the nexus between the travel and the unlawful scheme may be so "isolated, minimal, inconsequential, and nonessential" to the scheme that it is "insufficient to establish jurisdiction under the Travel Act." Id. at 735. See also Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971) (although the defendant ran a gambling establishment, his out-of-state customers were an insufficient basis for charging a Travel Act violation); United States v. Isaacs, 493 F.2d 1124, 1146 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974) (no Travel Act violation based on accepting a check that cleared through an out-of-state Federal Reserve Bank); United States v. McCormick, 442 F.2d 316 (7th Cir.1971) (no Travel Act violation based on advertising for an illegal lottery ticket salesman in a newspaper with 2-3% out-of-state subscribers).
 
 
 43
 In United States v. Wander, 601 F.2d 1251 (3d Cir.1979), this court found that there was a sufficient interstate nexus to establish a Travel Act violation based on acts similar to those in question in the case before us. In Wander a group of conspirators were acting in Pittsburgh. One member, Currie, went to Florida for reasons unrelated to the conspiracy. Nevertheless, telephone calls to Currie and travel by Currie in returning to Pittsburgh formed the basis for a Travel Act charge. We found that while the "extortion scheme could have been carried out without any interstate involvement had Currie remained in Pittsburgh .... once Currie moved to Florida it became essential to the implementation of the defendants' scheme that they use interstate facilities to secure her presence in Pittsburgh." Id. at 1255. Similarly, interstate travel was not an absolute necessity to the bribery scheme we are now considering, but because one of the participants, Stoneman, was in California, interstate travel did facilitate the planning and implementation of the scheme.
 
 
 44
 The district court has wide discretion in charging the jury. We will find that the court erred in refusing to give an instruction only if the instruction was correct, not substantially covered by other instructions, and was so important that the omission of the instruction prejudiced the defendant. See United States v. Sans, 731 F.2d 1521, 1539 (11th Cir.), cert. denied, 105 S.Ct. 791, 83 L.Ed.2d 785 (1984). The district court in this case adequately charged the jury on the need for a nexus between the travel and the bribery when it stated "transportation ... between one state and another state" requires proof that the "individual used the facility of interstate commerce with the specific intent to promote, manage, establish or carry on an unlawful activity...." The evidence shows that Torquato, alone or with Smith did meet with government officials as part of the bribery scheme after each of the trips.
 
 VI. ELEVEN PERSON JURY
 
 45
 On the fourth day of jury deliberation, after a three-month trial, one of the jurors was severely injured in an automobile accident. The defendants refused to stipulate to an eleven-person jury. The district court judge permitted the jury to continue deliberation with only eleven jurors pursuant to Federal Rule of Criminal Procedure 23(b), which states:
 
 
 46
 (b) Jury of Less Than Twelve. Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.
 
 
 47
 Rule 23(b) was amended in 1983 to give judges the discretion to allow eleven person juries to continue deliberation if one juror became unavailable. Before 1983, eleven person juries were permitted only by stipulation. Stoneman and Smith challenge the constitutionality of Rule 23(b).
 
 
 48
 Only two courts have considered the constitutionality of the discretionary part of Rule 23(b). A district court applied Rule 23(b) when one juror saw some notes of the United States Attorney after deliberations had begun. See United States v. Gambino, 598 F.Supp. 646 (D.N.J.1984). The Second Circuit recently considered the constitutionality of Rule 23(b) at length in United States v. Stratton, 779 F.2d 820 (2d Cir.1985), cert. denied, 54 U.S.L.W. 3562 (U.S. February 24, 1986). We agree with both of these courts that Rule 23(b) is constitutional.
 
 
 49
 The Supreme Court has held that a six-member jury is constitutionally permitted. See Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). It is clear to us that twelve jurors are not required for a conviction. Contrary to the defendant's contentions, Rule 23(b) does not allow a less than unanimous verdict. Rule 23(b) was amended to deal with those situations in which a juror became unavailable after a lengthy trial and a mistrial would be extremely burdensome. Rule 23(b) provides a better solution than the technique used in the past of substituting an alternate juror even after deliberations had begun. See United States v. Hillard, 701 F.2d 1052 (2d Cir.), cert. denied, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983). We find no constitutional defect in the rule.
 
 
 50
 VII. DISCLOSURE OF ALCOHOL TREATMENT RECORDS OF GOVERNMENT WITNESSES
 
 
 51
 Smith and Stoneman claim that the denial of their motion to order disclosure of the alcoholism treatment records of government witnesses John R. Torquato, Jr. and Judy Ellis deprived the defendants of their sixth amendment rights. Torquato and Ellis admitted that they had been alcoholics and had attended a rehabilitation center, the Care Unit Hospital of Orange, California ("Care Unit"), before the trial. The defendants cross-examined Torquato and Ellis on their alcoholism and had the opportunity to question the other witnesses, who had dealt with Torquato and Ellis, on any effects of the alcoholism. However, the defendants sought to obtain the treatment records of Torquato and Ellis from the Care Center. They were most concerned with the records of Torquato, the government's principal witness. They claimed that without the records they would be deprived of their sixth amendment rights to confrontation and compulsory process of witnesses.
 
 
 52
 The records of patients in drug rehabilitation programs that are assisted by the federal government must be kept confidential. See 42 U.S.C.A. Sec. 290dd-3(a) (West Supp.1985). A court may order disclosure pursuant to Sec. 290dd-3(b)(2)(C) and the regulations at 42 C.F.R. Sec. 2.61 (1985) if "good cause" has been shown. "In assessing good cause the court shall weigh the public interest and need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services." Id. The application should be denied when "other competent evidence of sources of information are available...." 42 C.F.R. Sec. 2.64(e) (1985). Records can be disclosed only if they contain objective data unless they fall within the exception in 42 C.F.R. Sec. 2.63 (1985) which provides that, "[w]hen a patient in litigation offers testimony or other evidence pertaining to the content of his communications with the program," the records may be disclosed. Because Torquato did not testify on his communications while in the program, this exception does not apply. Therefore, the defendants can seek the disclosure of only those portions of the records, if any, that contain objective data.
 
 
 53
 Although Torquato stated that he would waive the physician-patient privilege, there is a public interest in maintaining the confidentiality of patient records at the Care Unit. The defendants have not made a sufficient showing of need for the records. They wished to use the records to impeach Torquato's credibility. Torquato had admitted that he had been an alcoholic. Moreover he was subject to cross-examination for seven days and the defendants had the opportunity to examine other witnesses on Torquato's alcoholism. Therefore, we do not find that the defendants have shown good cause for disclosing the records or that their right to cross-examine Torquato was impaired. The public interest in confidentiality outweighs the defendant's needs when the records would provide little new material that could be used to impeach the witness's credibility. See United States v. Graham, 548 F.2d 1302, 1314 (8th Cir.1977); Bell v. State, 385 So.2d 78 (Ala.App.1980). A defendant is not entitled to obtain evidence that would only marginally impugn a witness's credibility but that would severely prejudice a public interest requiring confidentiality. Cf. United States v. Adams, 759 F.2d 1099 (3d Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 275, 88 L.Ed.2d 236 and --- U.S. ----, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985) (court limited cross-examination of witness in the Witness Protection Program).
 
 VIII. SEVERANCE OF STONEMAN'S TRIAL
 
 54
 Stoneman claims that he was prejudiced when the trial court denied his motion to have his trial severed pursuant to Federal Rule of Criminal Procedure 14. He conjectures that the consolidated trial confused the jury because the government used the term "CTA" to refer to both CTA, Ltd. and Computer Technology Associates, Inc. Stoneman did not object to the use of the name CTA during trial. Furthermore, we do not believe that the use of the term resulted in undue prejudice to Stoneman.
 
 
 55
 Stoneman also maintains that he was prejudiced by being tried with Smith because the extensive damaging evidence against Smith and testimony on Torquato's actions "rubbed off" onto Stoneman to render him guilty by association. See United States v. Mardian, 546 F.2d 973 (D.C.Cir.1976), citing United States v. Kelly, 349 F.2d 720, 756-59 (2d Cir.1965), cert. denied, 384 U.S. 947, 86 S.Ct. 947, 16 L.Ed.2d 544 (1966). We review the trial court decision not to sever the trial only for an abuse of discretion. See United States v. Boyd, 595 F.2d 120, 125 (3d Cir.1978); United States v. Somers, 496 F.2d 723 (3d Cir.), cert. denied, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). As long as the government has charged conspiracy in good faith, an allegation of conspiracy is a sufficient reason for trying the conspiracy and all substantive offenses together. See Somers, 496 F.2d at 729-30. In determining whether a particular defendant was prejudiced by a joinder of defendants, we look to whether the jury could compartmentalize the evidence against each defendant. A defendant is not entitled to a severance merely because the evidence against his codefendants is more damaging than the evidence against him. See United States v. DiPasquale, 740 F.2d 1282, 1293 (3d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985); United States v. Dansker, 537 F.2d 40, 62 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). We conclude that the jury could understand what evidence concerned each defendant and, therefore, that Stoneman was not prejudiced by the denial of his motion to sever the trial.
 
 
 56
 IX. SUFFICIENCY OF THE EVIDENCE TO CONVICT STONEMAN
 
 
 57
 Stoneman contends that there is insufficient evidence to support his conviction. In addressing this contention we must determine if there was sufficient evidence on which reasonable persons could find Stoneman guilty beyond a reasonable doubt. In doing so, we must view the evidence in a light most favorable to the government. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The district court found that the verdict was supported by substantial evidence.
 
 
 58
 The evidence showed that Stoneman incorporated the California corporation, Com-Max, Inc. He sent stock in the corporation to Pennsylvania officials including David I. Herbert, the State Director of Social Security, Robert Rade Stone, the President of Pittsburgh City Council, Scott O'Donnell, the Administrator of Allegheny County, and Ronald Schmeizer, an employee of the City of Pittsburgh. He also sent a check for $6,374.86, drawn on his own bank account, to Stone. Torquato testified that Stoneman was aware of the reason for sending stock, stock options, and the check to the Pennsylvania officials. Torquato also testified that Stoneman suggested his own bank account be used for the check to make it difficult to trace the payment to Torquato. The government noted that the cover letters to the officials refer to Stoneman and not Torquato, that the deposit slip for $6,374.86 was entered as a split deposit, and that the schedule of officers for Com-Max, Inc. was never filed with the California Secretary of State. The government claims that these actions were taken to avoid creating a paper trail to the company. Stoneman maintains that this argument is weak, since Stoneman's actions avoided any paper connection between Torquato and Com-Max, Inc., but provided ample evidence of a link between Stoneman himself and the corporation. There was evidence that Stoneman did not cooperate with the FBI investigation.
 
 
 59
 Stoneman contends that all of his actions were the normal activities of an attorney for a small corporation. He claims that he had no knowledge of who the Pennsylvania officials were or that any bribery scheme existed. A person is not guilty of conspiracy unless he had knowledge of the illicit purpose of the conspiracy when he performed acts that furthered that purpose. See United States v. Klein, 515 F.2d 751, 753 (3d Cir.1975). There was no direct evidence that Stoneman had knowledge of some improper purpose. Stoneman also observes that the government offered no evidence of motive. See United States v. Wise, 108 F.2d 379 (7th Cir.1939). There was no evidence that Stoneman received, or would ever have received, anything more than his normal attorney fees. However, the jury was entitled to make a finding of knowledge and therefore guilt based on circumstantial evidence and credibility. Clearly, the jury did not believe Stoneman's explanations of his actions. We find that the jury could properly infer guilt from the evidence presented. See United States v. Ordones, 469 F.2d 70, 71 (9th Cir.1972) (jury need not believe defendant's story that he had no knowledge).
 
 X. CONCLUSION
 
 60
 For the reasons discussed above we will affirm the judgment of the district court in all respects.
 
 
 
 *
 Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The amount of FICA tax paid by the employees of state and local governments in Pennsylvania is matched by the employing state or political subdivision. However, the tax need not be paid for employees subject to certain benefits for illness. If the government mistakenly pays the FICA taxes, it can claim a credit against future taxes and a refund for the employee. The procedure of obtaining the credits and refunds is known as FICA recovery. The defendant corporations sought contracts to prepare and submit FICA recoveries on behalf of state and local governments. The fees charged are determined by public bidding
 
 
 [2]
 Rule 30 provides:
 At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adverse parties. The court shall inform counsel of its proposed action upon the request prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.
 
 
 [3]
 Supplementary instruction # 32 stated:
 Even if you find that multiple conspiracies existed, you still must individually consider the substantive violations contained in counts 2 through 16, and determine if a particular defendant is criminally responsible for these distinct uses of the United States mail and the facilities of interstate commerce.
 We need not address the defendant's argument that instruction # 32 was improper since the jury found the defendants guilty of conspiracy and therefore did not need to follow instruction # 32.
 
 
 [4]
 18 U.S.C. Sec. 1952 states:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent--
 (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime of violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity.
 and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, ...