**UNITED STATES of America, Appellee,**

**v.**

**Andrew JENKINS, Defendant-Appellant.**

**No. 939, Docket 90-1494.**

United States Court of Appeals, Second Circuit.

Argued March 19, 1991.

Decided Aug. 13, 1991.

William M. Kunstler, New York City (Ronald L. Kuby, of counsel), for defendant-appellant.

Steven A. Standiford, Asst. U.S. Atty., S.D.N.Y. (Otto G. Obermaier, U.S. Atty., Jeh C. Johnson, and Debra Ann Livingston, Asst. U.S. Attys., S.D.N.Y., of counsel), for appellee.

Before MESKILL, MINER and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Andrew Jenkins appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York (Charles M. Metzner, *Judge*). In a two-count superseding indictment, Jenkins was charged with violating 18 U.S.C. § 1952(a) (1988) ("Travel Act"), and 12 U.S.C. § 378 (1988) ("Glass-Steagall Act"). Specifically, Count I alleged that Jenkins had used and caused to be used facilities of interstate and foreign commerce, including the telephone, with the intent to promote, manage, establish and carry on money laundering activities in violation of 31 U.S.C. §§ 5316(a) and 5322. *See* 18 U.S.C. § 1952(a) & (b). Count II charged that Jenkins had engaged in the business of receiving bank deposits without proper authorization under federal and state law. *See* 12 U.S.C. § 378. After a jury trial, Jenkins was convicted on both counts.

On appeal, Jenkins challenges his conviction, contending that the indictment failed to set forth a legally cognizable Travel Act violation. Jenkins also argues that, for a variety of reasons, the government failed to establish that he accepted an actual bank deposit in violation of the Glass-Steagall Act. Finally, Jenkins asserts that, in violation of the Sixth Amendment, he was represented by counsel who labored under a conflict of interest.

For the reasons stated below, we affirm the judgment of conviction on both the Travel Act and Glass-Steagall Act counts.

## BACKGROUND

The present case arises out of a money laundering investigation conducted by the Federal Bureau of Investigation ("FBI"). From June 5 to August 1, 1987, New York State Senator Andrew Jenkins had a series of meetings with a man he believed to be "Dan Garth," a Texas businessman. Jenkins' introduction to Garth was arranged by Louis Moore, a Jenkins acquaintance who was operating as a government informant. Moore had told Jenkins that Garth and his associates had some cash that they wanted to "clean up" and suggested that Jenkins and Garth meet. Unbeknownst to Jenkins, Dan Garth was actually an FBI undercover agent, named David Maniquis, who was surreptitiously tape recording their meetings. Those tapes ultimately formed a large portion of the body of evidence introduced against Jenkins at trial.

The first meeting between Jenkins and Maniquis occurred on June 5, 1987. Dur-

ing that meeting, Maniquis explained his situation as follows:

> We're in a position now where we have a lotta cash at our disposal, but we're in a situation where we can't use it the way it is. You know without going into detail.... I'm always trying to find other people who could possibly, who have companies, investment opportunities where we can move around some of this money so that when it comes back to us, we can use it.

Further, Maniquis stated: "we're trying to find some creative ways ... in moving some of this money around so that when [ ] it comes back to us ... we can account for why we have it." Maniquis then mentioned that he had heard that Jenkins had "some banking contacts where we could [ ] possibly set something up." Eventually, Jenkins suggested, among other things, that a bank he owned in Africa might be of some use and observed that "[b]anks abroad don't question where you get your money." At the conclusion of the meeting, Jenkins said that "given a little time I could come up with a good something on this."

On June 26, Jenkins and Maniquis met again. At this meeting, Jenkins essentially proposed that Maniquis funnel $150,000 to Jenkins' bank in Zaire (subsequently identified as the "Afro-American Development Bank"). According to Jenkins, this money would allow the bank "to settle some debts and deposits" and, as a result, obtain a $50 million letter of credit from the Central Bank of Zaire. Once the letter of credit was obtained, the bank would be in a position to finance a lumber operation. Further, Maniquis would then begin the delivery of additional sums of money. Presumably, Maniquis' money would be returned in the guise of income from the lumber operation. It thus would look as if the money was nothing more than profits earned through investing in a highly speculative venture. Jenkins also assured Maniquis that his money would not be at risk and that it would be returned within one year.

The conversation eventually turned to the means by which the money would be transported from the United States to Zaire. Maniquis indicated that he was reluctant to use a wire transfer since it would create a record. Jenkins therefore proposed that he either personally deliver the money or send it by diplomatic pouch. According to Jenkins, Zaire customs agents do not inspect diplomatic pouches when they enter the country. Similarly, Jenkins stated that because he was a State Senator he was routinely admitted into Zaire without his luggage being searched. Jenkins also noted that "[m]oney doesn't show up on the X-ray." Eventually, the parties agreed that Jenkins would personally carry the money to Zaire.

Following the June 26th meeting, Jenkins directed his secretary, Barbara Washington, to make travel arrangements for a trip to Zaire. Accordingly, Washington used the telephone to make a reservation for Jenkins on a Sabena World Airways flight that was scheduled to leave New York on August 1 and, after a six to eight hour lay-over in Belgium, arrive in Zaire on August 3. Washington also booked Jenkins on a flight that would return to New York on August 9.

Further details of the plan were discussed when Jenkins and Maniquis again met on July 25th. Jenkins now identified the Afro-American Bank as the institution in which Maniquis' money would be deposited and revealed that he controlled fifty percent of the bank's stock. Jenkins again guaranteed that Maniquis' money would not be at risk and that he could reclaim it whenever he desired. Further, Jenkins continued to assure Maniquis that he would be able to carry the $150,000 into Zaire without any difficulties. At this point, referring to the federal statute prohibiting the transportation of more than $10,000 outside the United States without filing a Currency or Monetary Instrument Report ("CMIR"), *see* 31 U.S.C. § 5316(a), Maniquis asked Jenkins what he intended to do about the "Customs form you're supposed to fill out, if you're bringing a certain amount of money out of the [United States]." Jenkins was apparently unaware

of the requirement and told Maniquis that he would "check that out."

On July 31, the day before Jenkins was scheduled to depart for Zaire, he and Maniquis had yet another meeting. Jenkins now showed Maniquis the Afro-American Bank's charter, the minutes of an incorporation meeting and a document demonstrating that the bank already had substantial funds on deposit. The conversation eventually turned to a discussion of how Jenkins intended to avoid disclosing that he was transporting $150,000 in cash outside the United States. Although Jenkins stated that "I will never ever say I'm gonna break the law," he nonetheless repeatedly assured Maniquis that a CMIR would not be filed and that the cash would not be discovered. Indeed, Jenkins indicated that he fully understood that filing a CMIR would defeat the purpose of the scheme and guaranteed that he would not fill out the form, even if confronted by a customs agent. Finally, Jenkins and Maniquis agreed to meet the following morning at the Plaza Hotel in Manhattan. At that time, Maniquis was to give $150,000 in cash to Jenkins, who would then proceed to the airport where he would commence his journey to Zaire.

As agreed, Jenkins and Maniquis met at a restaurant in the Plaza Hotel on the morning of August 1. Maniquis handed over a soft leather briefcase containing $150,000 in cash. Jenkins took the briefcase and placed it within his larger briefcase. Shortly thereafter, as he was leaving the restaurant, Jenkins was arrested. At the time of the arrest, Jenkins was carrying the briefcase with the $150,000. The arresting officers also found that the briefcase contained Jenkins' passport with a current visa to Zaire, a round-trip airline ticket to Zaire and a document showing that Jenkins had obtained the vaccinations necessary for travel to Zaire.

On September 29, 1987, a grand jury handed down a two-count indictment against Jenkins. Count I charged that Jenkins was "about to transport monetary instruments of more than $10,000" from New York to Zaire without filing the customs form required by 31 U.S.C. § 5316(a). *See* 18 U.S.C. § 1952(a). Count II charged that Jenkins, while acting as a principal and agent of the "Afro-American Development Bank of Zaire," engaged in the business of receiving deposits without proper authorization under federal and state law, in violation of the Glass-Steagall Act. *See* 12 U.S.C. § 378(a)(2).

Jenkins subsequently filed a motion to dismiss Count I of the indictment, arguing that he had no duty to file the customs form before arriving at the airport. The district court agreed and therefore dismissed Count I. *See United States v. Jenkins*, 689 F.Supp. 342, 344 (S.D.N.Y.1988). In addition, Jenkins sought to suppress the evidence seized from his briefcase at the time of his arrest. The district court ruled that, although it was permissible for the government to retrieve the sting money, there was no legitimate ground to seize the other evidence contained in the suitcase. While the government did not challenge the dismissal of Count I, it did appeal the district court's suppression ruling. We reversed and remanded for a hearing to determine whether the documents in question were legitimately seized under the plain view exception to the Fourth Amendment warrant requirement. *See United States v. Jenkins*, 876 F.2d 1085, 1088 (2d Cir. 1989) (per curiam). On remand, the district court conducted an evidentiary hearing and held that there was no need to suppress Jenkins' passport, vaccination card and airline tickets. The district judge, however, suppressed certain bank records that were discovered within a manila folder inside Jenkins' briefcase.

On December 14, 1989, a two-count superseding indictment was filed against Jenkins. Count I now charged that in violation of the Travel Act, 18 U.S.C. § 1952(a), Jenkins had used and caused to be used facilities of interstate and foreign commerce with the intent to promote, manage, establish and carry on money laundering activities, *i.e.*, transportation in excess of $10,000 from the United States without filing a CMIR as required by 31 U.S.C. §§ 5316 and 5322. Count II of the su-

perseding indictment was identical to Count II of the original indictment.

At trial, the parties stipulated that:

(A) At no time was an entity called the Afro-American Development Bank incorporated under the laws of the United States or New York State. Furthermore, at no time were Andrew Jenkins or an entity called the Afro-American Development Bank authorized or permitted by state or federal law to engage in receiving deposits;

(B) Neither Andrew Jenkins nor an entity called the Afro-American Development Bank was subjected by the law of the United States or the State of New York to examination and regulation; nor did

(C) Andrew Jenkins or an entity called the Afro-American Development Bank submit to periodic examination by the banking authorities of New York State or make and publish periodic reports.

Jenkins was tried before Judge Metzner and a jury, and was convicted on both the Glass-Steagall and Travel Act charges.

Following his conviction, Jenkins filed a post-trial motion to arrest judgment or to set aside the verdict and enter a judgment of acquittal. *See* Fed.R.Crim.P. 29(c) & 34. In a written opinion, Judge Metzner denied the motion. Thereafter, Jenkins obtained new counsel and moved for a new trial on the ground of an alleged conflict of interest between Jenkins and his trial counsel. *See* Fed.R.Crim.P. 33. Judge Metzner also denied this motion. Jenkins was ultimately sentenced to concurrent terms of one year and one day imprisonment on each count and to a $50 special assessment on each count.

This appeal followed.

## DISCUSSION

### 1. *Count I—The Travel Act*

The Travel Act is violated when (1) a person uses a facility of interstate or foreign commerce, such as the telephone, (2) with intent to "facilitate the promotion, management, establishment, or carrying on, of any unlawful activity" and (3) thereafter performs an additional act in furtherance of the specified unlawful activity. 18 U.S.C. § 1952(a); *see United States v. Harris,* 903 F.2d 770, 773 (10th Cir.1990); *United States v. Biaggi,* 853 F.2d 89, 101 (2d Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989); *United States v. Walsh,* 700 F.2d 846, 852–53 (2d Cir.), *cert. denied,* 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983). The "unlawful activity" at issue in the present case is transporting in excess of $10,000 from the United States without filing a CMIR as required by 31 U.S.C. §§ 5316 and 5322. *See* 18 U.S.C. § 1952(b)(i)(3).

At trial, the government satisfied the elements of the Travel Act by proving that Jenkins (1) intended to engage in an unlawful activity, namely transporting $150,000 outside the United States without filing a CMIR; (2) caused his secretary, Barbara Washington, to use the telephone to make travel arrangements to Zaire, thus facilitating the unlawful activity; and thereafter (3) performed an additional facilitating act by accepting $150,000 in cash from Maniquis.

Despite the foregoing, Jenkins now argues that the Travel Act violation charged in Count I of the superseding indictment failed to set forth a legally cognizable offense. Specifically, Jenkins contends that the Travel Act sets forth a crime of attempt, *i.e.,* that he was essentially charged with attempting to "transport ... monetary instruments of more than $10,000 ... from a place in the United States to ... a place outside the United States" without filing a CMIR. 31 U.S.C. § 5316. From this premise, Jenkins asserts that his conviction must be reversed because "there is no such crime as attempting to cause one's own crime of omission" and "Congress did not intend to create a crime of attempting or facilitating one's own omission of filing the requisite customs form." We disagree.

Jenkins was not charged with "attempting" to transport in excess of $10,000 from the United States without filing a CMIR. He was charged with violating the Travel Act. The nature and elements of

the Travel Act are plainly distinct from the crime of attempt. The Travel Act is a substantive offense that in-and-of-itself punishes individuals for using facilities of interstate or foreign commerce to further certain unlawful activities. *Cf. Erlenbaugh v. United States,* 409 U.S. 239, 246, 93 S.Ct. 477, 481–82, 34 L.Ed.2d 446 (1972); *United States v. Teplin,* 775 F.2d 1261, 1265 (4th Cir.1985). In contrast, the crime of attempt is an inchoate offense that provides a means of punishing individuals who have sufficiently manifested their intent to commit a particular substantive offense yet have failed to consummate the crime. *See United States v. Stallworth,* 543 F.2d 1038, 1040–41 (2d Cir.1976); W. LaFave & A. Scott, Criminal Law § 6.2(b), at 498–500 (2d ed. 1986); *see, e.g.,* Model Penal Code § 5.01(1)(c) & 2 (Proposed Official Draft 1962); N.Y. Penal Law § 110.00 (McKinney 1987). Unlike the crime of attempt, the Travel Act does not require that the government establish that the accused took a substantial step in furtherance of the intended unlawful activity. Rather, as discussed above, to establish a Travel Act violation the government must prove that the defendant used a facility of interstate or foreign commerce to "make easier or facilitate" the intended unlawful activity, and thereafter did one additional act in furtherance of the unlawful activity. *United States v. Smith,* 789 F.2d 196, 203 (3rd Cir.), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); *accord United States v. Rogers,* 788 F.2d 1472, 1476 (11th Cir.1986); *United States v. Davis,* 780 F.2d 838, 843 (10th Cir.1985); *see also Harris,* 903 F.2d at 773 (likening the necessary proof to an overt act); *United States v. Stafford,* 831 F.2d 1479, 1483 (9th Cir.1987) (same). Accordingly, Jenkins' characterization of Count I of the indictment as an attempt charge is mistaken and the argument flowing from that faulty premise is without merit.

We also note that Jenkins is in error when he maintains that Congress did not intend to permit the government to predicate a Travel Act violation on the failure to file a CMIR. Congress specifically amended the Travel Act to include, *inter alia,* the transportation of currency outside the United States without filing a CMIR in violation of 31 U.S.C. §§ 5316(a) and 5322. As the government points out, this expansion of section 1952 provides authoritative evidence that Congress intended to prohibit the use of telephone facilities in connection with the illegal export of United States currency.

2. *Count II—The Glass–Steagall Act*

Jenkins was convicted of violating the Glass–Steagall Act by engaging "in the business of receiving *deposits* subject to ... repayment" without proper state or federal authorization. 12 U.S.C. § 378(a)(2) (emphasis added). On appeal, Jenkins claims that this conviction must be reversed because the government failed to establish that the $150,000 he received was a "deposit." Jenkins grounds his argument on the following assertions: (1) the government failed to prove that an actual bank existed into which a deposit could be made; (2) the evidence at trial indicated that the $150,000 received from Maniquis was to be used as start-up capital for the Afro–American Bank—not as a deposit in the bank; and (3) the depositor was an undercover FBI agent who had no intention of making an actual deposit. We consider and reject each of these assertions in turn.

First, Jenkins asserts that the government failed to establish that a bank actually existed. Simply stated, the plain language of section 378(a)(2) does not require the government to prove the existence of an actual bank in order to obtain a conviction. Indeed, such an interpretation of the statute would permit individuals, who either mistakenly or deceitfully profess to represent banks, to accept deposits and then evade the reach of section 378(a)(2). Clearly, such was not the intent of Congress when it passed this landmark legislation. Accordingly, we are convinced that section 378(a)(2) prohibits any entity that claims to be a bank, or any person who purports to represent a bank, from engaging in the business of receiving deposits without proper authorization—regardless of whether an actual bank exists.

Second, Jenkins maintains that the evidence established that the $150,000 he received from Maniquis was an investment, rather than a deposit, in the Afro-American Bank. In other words, he contends that there was insufficient evidence to support the jury's finding that the $150,000 was a bank deposit. Reviewing this claim, we bear in mind that "[a] conviction must be allowed to stand if, 'after viewing the evidence in the light most favorable to the prosecution,' the reviewing court finds that '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir. 1989) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)), *cert. denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1990). Further, we are required to "examine the evidence ... in its entirety and credit all reasonable inferences that can be drawn in favor of the prosecution." *United States v. Coonan,* 938 F.2d 1553, 1559 (2d Cir.1991).

As commonly understood, the term "deposit" means a sum of money placed in the custody of a bank, to be withdrawn at the will of the depositor. *See* 5A Michie on Banks and Banking, Ch. 9, § 3, at 23 (1983); Black's Law Dictionary 395 (5th ed. 1979). Here, the tape recorded conversations between Jenkins and Maniquis provide ample support for the jury's finding that the $150,000 was a deposit. For example, Jenkins stated that, once the bank received Maniquis' $150,000, "[y]our money will be here for your use." Further, in sharp contrast to investment in a new banking venture, Jenkins repeatedly assured Maniquis that his money would not be at risk. Jenkins also told Maniquis that the Afro-American Bank was in existence and showed Maniquis documents demonstrating this fact. Such conduct is clearly inconsistent with Jenkins' suggestion that the $150,000 was accepted as financing which would be used to establish a bank. In sum, we find that the evidence fully supports the jury's verdict.

Jenkins' third assertion focuses on the intentions of Agent Maniquis when he delivered the $150,000. Specifically, Jenkins argues that the money cannot be considered a deposit because the depositor was an FBI undercover agent who did not possess an actual intent to enter into a debtor-creditor relationship. We think that this argument is overly technical and ignores the plain meaning of the statute. The Glass-Steagall Act makes it unlawful for a "person ... to engage, to any extent whatever ... in the business of receiving deposits." 12 U.S.C. § 378(a)(2). As the above analysis demonstrates, Jenkins took custody of the money on behalf of the Afro-American Bank and agreed to return it at the will of Maniquis. Simply put, he accepted a deposit. We fail to see how this essential fact is in any way undermined by what Jenkins now describes as Maniquis' actual intention.

In light of the foregoing, we are convinced that Jenkins was impermissibly engaging in the business of receiving deposits and therefore was properly convicted of violating the Glass-Steagall Act.

3. *Defense Counsel's Conflict of Interest*

Jenkins next argues that reversal of his conviction is warranted because at the time of trial his counsel, Samuel Abady, had an application pending for a position with the U.S. Attorney's Office for the Southern District of New York, *i.e.,* the office that was prosecuting Jenkins. The government does not dispute that Abady's pending application created a potential conflict of interest. Instead, the government stresses that prior to trial Jenkins was notified of Abady's pending application, decided to proceed with Abady as his counsel and specifically waived the potential conflict. Although Jenkins admits that he did agree to proceed with Abady, he now asserts that his waiver was not knowing and intelligent. We disagree.

The facts relevant to this dispute are as follows. On May 6, 1988, Samuel Abady entered his appearance on behalf of Jenkins. On March 22, 1990, Abady applied for a position with the U.S. Attorney's Of-

fice for the Southern District of New York. At a pretrial conference on April 5, Abady apparently advised the court and the government of his pending application. Further, Abady explained that the application would be held in abeyance at least until completion of Jenkins' trial. On April 18, approximately two weeks before the commencement of the trial, a hearing on the potential conflict was held before District Judge Metzner. During the course of the hearing, the district judge engaged in the following colloquy with Jenkins and Abady:

COURT: Do you know why you're here?

JENKINS: Yes, sir.

COURT: Why?

JENKINS: Mr. Samuel Abady, my attorney in this matter, has made an application to the U.S. Attorney's Office for a job....

* * * * * *

COURT: Mr. Abady, have you discussed the contents of this letter [from the government to the court detailing the potential conflict of interest] with your client?

ABADY: I have, your honor. Forgive me that I didn't show it to him, but I described it to him in detail.

COURT: Did you tell him that in view of the fact that you are trying to obtain a favor from the U.S. Attorney's Office there might be some conflict of interest in your representing him as a defendant in this court?

ABADY: If your Honor wishes to characterize it as a favor. I did tell him it was [the government's] position that my application—the mere presentation of a written application [—] could constitute such a conflict, and I was therefore obliged to apprise him of that and I did so.

COURT: Mr. Jenkins, do you understand that Mr. Abady has made this application?

JENKINS: Yes, I do.

COURT: Do you understand that potentially it could involve a conflict of interest in representing you because in representing you he must exert his best efforts to defend you, but at the same time he is asking to be employed by the prosecution, which could present a conflict of interest? Do you understand that?

JENKINS: Yes, I understand that.

COURT: [H]ave you weighed that possible conflict carefully in your mind?

JENKINS: Oh, I found out about it yesterday and I prayed about it all night.

COURT: Do you wish any time to consult with another attorney as to what your answer should be?

JENKINS: No.

COURT: What is your educational background?

JENKINS: I am a[n] attorney by profession.

COURT: You are an attorney?

JENKINS: Yes, I am. I am a graduate of Fordham University.

COURT: You understand clearly what is going on here?

JENKINS: I believe I do.

COURT: You have indicated you have carefully weighed this problem in your mind and do you wish to continue to be represented by Mr. Abady in these proceedings?

JENKINS: Yes, I do.

As a result of the foregoing, Abady was permitted to proceed as Jenkins' counsel. After trial, having obtained new counsel, Jenkins moved for a new trial on the ground that Abady had labored under a conflict of interest that had not been properly waived. The district court denied the motion.

There is no dispute that "a criminal defendant has an absolute right under the Sixth Amendment to be represented by an attorney who has no conflict of interest." *United States v. Curcio*, 680 F.2d 881, 885 (2d Cir.1982) (citing *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1177–78, 55 L.Ed.2d 426 (1978) and *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 464–65, 86 L.Ed. 680 (1942)). We have recognized, however, that "the effect of the Sixth Amendment guarantee is to grant a right, not to impose an obligation." *Cur-*

*cio,* 680 F.2d at 885; *see Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 241–42, 87 L.Ed. 268 (1942) ("What were contrived as protections for the accused should not be turned into fetters."). Consequently, a defendant is permitted to waive the right to proceed with conflict-free counsel.

In seeking to assure that such waivers are knowing and intelligent, we have instructed that trial courts should:

> advise the defendant of his right to ... conflict-free representation, instruct the defendant as to problems inherent in being represented by an attorney with divided loyalties, allow the defendant to confer with his chosen counsel, encourage the defendant to seek advice from independent counsel, and allow a reasonable time for the defendant to make his decision.

*Curcio,* 680 F.2d at 890; *see also United States v. Friedman,* 854 F.2d 535, 573–74 (2d Cir.1988). Transcending these prescriptions, however, is the common sense notion that the existence of a knowing and intelligent waiver inevitably depends "upon the particular facts and circumstances surrounding [each] case, including the background, experience, and conduct of the accused." *Friedman,* 854 F.2d at 574 (quoting *Curcio,* 680 F.2d at 888) (citations & internal quotation marks omitted). As we intimated in *United States v. Friedman,* 854 F.2d at 574, the scope and breadth of the district court's inquiry will necessarily reflect the sophistication, intelligence and comprehension of the particular defendant. Thus, in considering if a defendant's waiver was adequate, we are more concerned with whether the defendant appreciated his predicament and made a properly informed choice than we are with whether the trial judge recited any particular litany of questions.

In the present case, it is obvious that the district court properly concluded that Jenkins' waiver was knowing and intelligent. It is abundantly clear from Jenkins' responses to Judge Metzner's questions that Jenkins completely understood the potential risks arising from Abady's application to the U.S. Attorney's Office. Further, Jenkins had at least twenty-four hours to consult with Abady and decide how he wished to proceed. Indeed, when the district judge asked Jenkins whether he had carefully considered the matter, he replied, "I prayed about it all night." Jenkins also was offered and rejected the opportunity to consult with outside counsel. Finally, we think it is highly significant that Jenkins was no neophyte to the criminal justice system. Rather, he was a lawyer who had been employed both as an assistant district attorney and as a defense attorney. Moreover, while a State Senator, Jenkins had served on the Judiciary Committee and the Committee on Crimes and Corrections. Thus, as Judge Metzner noted, Jenkins was extremely well-suited to determine whether he wished to proceed with Abady as his trial counsel. Under these circumstances, we have no difficulty concluding that Jenkins knowingly and intelligently waived his right to conflict-free counsel.

## CONCLUSION

We have reviewed each of the defendant-appellant's remaining arguments and find them to be without merit. For the reasons stated above, the judgment of conviction is affirmed.