**UNITED STATES of America**

v.

**Russell McLAUGHLIN, Jr., Appellant in No. 96–1982.**

**UNITED STATES of America**

v.

**Mark McLAUGHLIN, Appellant in No. 96–2000.**

**Nos. 96–1982, 96–2000.**

United States Court of Appeals, Third Circuit.

Argued June 2, 1997.

Decided Sept. 11, 1997.

Robert E. Welsh, Jr., (Argued) Catherine M. Recker, Welsh & Recker, P.C., Philadelphia, PA, for Appellants Russell McLaughlin, Jr. and Mark McLaughlin.

Maureen Barden, Assistant United States Attorney (Argued), Walter S. Batty, Jr., Assistant United States Attorney, Philadelphia, PA, for Appellee United States of America.

Before: BECKER, SCIRICA, Circuit Judges, and SCHWARZER,* Senior District Judge.

## OPINION OF THE COURT

SCHWARZER, Senior District Judge.

Russell and Mark McLaughlin (the "McLaughlins") appeal from their convictions and sentences for income tax evasion. The McLaughlins and their relatives own Building Inspection Underwriters ("BIU"), a close corporation that conducts building inspections for various New Jersey and Pennsylvania municipalities. Russell was president of BIU, and Mark was an officer of the corporation. In 1988, BIU opened two bank accounts, one with New Jersey National Bank ("NJNB") and the other with First Fidelity Bank ("First Fidelity"). During 1988, over $700,000 in corporate receipts was deposited in each of those accounts. Neither BIU nor the McLaughlins declared the roughly $1,400,000 deposited in the accounts as income on BIU's 1988 federal tax returns.

Both McLaughlins were convicted of attempting to evade assessment of BIU's 1988 income taxes in violation of 26 U.S.C. § 7201. Russell was also convicted of subscribing and filing a false 1988 income tax return on behalf of BIU in violation of 26 U.S.C. § 7206(1). They were acquitted of conspiring to defraud the United States. *See* 18 U.S.C. § 371. The McLaughlins were sentenced on the basis of an adjusted offense level of 17. The district court sentenced them both to twenty-four months in custody and three years supervised release and fined each $100,000.

---

* Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

The district court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291.

## I. APPLICATION OF THE FIFTH AMENDMENT PRIVILEGE TO NON-PRODUCTION OF SUBPOENAED DOCUMENTS

In 1989, the IRS served a summons on Russell, in his capacity as BIU's corporate custodian, requesting production of certain financial records. At trial, the government was permitted to show that Russell produced records and that the production did not include any record of the NJNB account. The government was also allowed to argue that this omission was evidence of intentional evasion of tax assessment.[1]

Russell contends that admission of this evidence violated his Fifth Amendment privilege against self-incrimination. Relying on *Braswell v. United States*, 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988), he argues that because he produced corporate records under compulsion of a subpoena directed to him as corporate custodian, *see Baltimore v. Bouknight*, 493 U.S. 549, 555–56, 110 S.Ct. 900, 905–06, 107 L.Ed.2d 992 (1990) (quoting *Fisher v. United States*, 425 U.S. 391, 411, 96 S.Ct. 1569, 1581, 48 L.Ed.2d 39 (1976)); *Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974); *Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911); *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), the

Fifth Amendment's Self–Incrimination Clause barred the government from offering evidence of his personal failure to comply adequately with the subpoena. Russell raised the objection in a motion *in limine*, which the district court denied by "a definitive ruling 'with no suggestion that it would reconsider the matter at trial.'" *Government of V.I. v. Joseph*, 964 F.2d 1380, 1385 (3d Cir.1992) (citing *American Home Assur. Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 325 (3d Cir.1985)). Thus, the issue is properly before us, *see United States v. Mejia–Alarcon*, 995 F.2d 982, 986 (10th Cir. 1993) (citing *American Home*, 753 F.2d at 324–25), and we exercise plenary review. *See In re Grand Jury Subpoena*, 957 F.2d 807, 809 (11th Cir.1992).

### A. *Existence of a Testimonial Privilege*

▆ "[B]ecause the act of complying with [a] government [subpoena] testifies to the existence, possession, or authenticity of the things produced," such production may implicate Fifth Amendment rights. *Bouknight*, 493 U.S. at 555, 110 S.Ct. at 905; *Fisher*, 425 U.S. at 410, 96 S.Ct. at 1580–81; *Curcio v. United States*, 354 U.S. 118, 125, 77 S.Ct. 1145, 1150, 1 L.Ed.2d 1225 (1957). Since a corporate custodian produces documents in his representative rather than his personal capacity, he may not invoke his right against self-incrimination in order to resist a subpoena for corporate records.[2]

---

1. Count One of the indictment (the conspiracy count) specifically referred to Russell's failure in responding to the summons to disclose to the IRS the NJNB account and to provide books and records concerning it. Count Two inferentially referred to Russell's nonproduction by charging him with "concealing ... from the Internal Revenue Service the ... location [of BIU income]."

2. Judge Becker expresses concern over the application of agency principles to situations such as this case. However, when the government serves a subpoena on a person as corporate custodian, it designates that person to serve as the corporation's agent. *See Braswell*, 487 U.S. at 118 n. 11, 108 S.Ct. at 2295 n. 11 ("[A] corporate custodian acts as an agent and not an individual when he produces corporate records in response to a subpoena addressed to him in his representative capacity."). The government could hardly contend, after it has received a response and to circumvent *Braswell*, that in

some particular respect, the custodian was not acting as corporate agent. If the custodian acts negligently, or even dishonestly, he is no less acting in the course of that agency, even if a claim may lie against him for malfeasance. It could, of course, be that a person served with a subpoena is not authorized to produce corporate documents, in which case he is not acting as corporate custodian and all bets are off; a former employee, for example, who produces purloined corporate documents is obviously not within the scope of the *Braswell* rule. But we do not go behind the assertion of the Fifth Amendment privilege in other situations to ensure that the claim is legitimate—to do so would obviously undermine the privilege. The attack on the "devious custodian" or the "non-producing custodian" is by way of contempt proceedings, not by an examination into his "agency" or the legitimacy of his personal Fifth Amendment privilege. In sum, the outcome is perfectly symmetrical—the corporate custodian qua custodian must comply

*Hale,* 201 U.S. at 69–70, 26 S.Ct. at 376–77. Thus, in *Braswell,* the Court wrote that:

> [T]he government concede[d], as it must, that it may make no evidentiary use of the "individual act" against the individual.... [T]he Government may not introduce into evidence ... that the subpoena was served upon and the corporation's documents were delivered by one particular individual, the custodian.... Because the jury is not told that the defendant produced the records, any nexus between the defendant and the documents results solely from the corporation's act of production and other evidence in the case.

487 U.S. at 118, 108 S.Ct. at 2295.

The government contends that *Braswell* does not apply here because *Braswell* concerned *production* of documents rather than their *nonproduction.* The distinction is without a difference. The government's concession in *Braswell* that it may make no evidentiary use of the "individual act" against the individual is not restricted to material actually produced but is instead broad enough to encompass the implications of production, including its incompleteness. As Justice Kennedy has noted:

> An individual who produces documents may be asserting that [the documents] satisfy the general description in the subpoena, or that they were in his possession or under his control. [In either case, those] assertions can convey information about that individual's *knowledge* and *state of mind* as effectively as spoken statements....

*Id.* at 122, 108 S.Ct. at 2297 (Kennedy, J., dissenting) (emphasis added); *see Fisher,* 425 U.S. at 410, 96 S.Ct. at 1580–81; *Curcio v. United States,* 354 U.S. 118, 125, 77 S.Ct. 1145, 1150, 1 L.Ed.2d 1225 (1957). Thus, the

testimonial aspect of production is not limited to the act of handing material over to the government—it also may include the custodian's exercise of discretion over which material to produce and which to omit. Incomplete production may therefore be as communicative as complete production.

While "[t]he act of producing documents in response to a subpoena ... has communicative aspects of its own, wholly aside from the contents of the papers produced[,] ... whether the tacit averments of the taxpayer are both 'testimonial' and 'incriminating' for purposes of applying the Fifth Amendment ... depend on the facts and circumstances of particular cases...." *Braswell,* 487 U.S. at 103, 108 S.Ct. at 2287 (quoting *Fisher v. United States,* 425 U.S. 391, 410, 96 S.Ct. 1569, 1580–81, 48 L.Ed.2d 39 (1976)). In this case, we find that the government's use at trial of evidence concerning Russell's nonproduction makes plain both its testimonial and its incriminating qualities. *Cf. Fisher,* 425 U.S. at 410–11, 96 S.Ct. at 1580–81 (resolving the case on the appellate record even though the determination was factual). The government introduced evidence of nonproduction not only as an overt act in furtherance of the conspiracy to evade assessment, *see* Superseding Indictment at 8–9, but also as testimonial evidence of a guilty mind, *see* Superseding Indictment at 9; Trial Tr., Mar. 12, 1996, at 142–43 (government's closing argument); Trial Tr., Mar. 1, 1996, at 82, 88 (direct testimony of investigating agent regarding receipt of corporate records and meeting with Russell); Trial Tr., Feb. 27, 1996, at 15 (government's opening statement).[3] The government's repeated reference to Russell's incomplete act of production as evidence of his culpability flies in the face of *Braswell* and vitiated Russell's Fifth Amendment privilege.[4]

---

with a records subpoena and the government is barred from offering the testimonial and incriminating aspects of that production (including nonproduction) against him.

3. It thus bore not only on Count Two but also on Count Three ("willfully" making and subscribing a false return). 26 U.S.C. § 7206(1).

4. The government would have us make an exception to the Fifth Amendment where the custodian's nonproduction is in furtherance of his alleged offense. While such exceptions to certain privileges do exist (e.g., crime or fraud exception to the attorney-client privilege, *see In re Sealed Case,* 107 F.3d 46 (D.C.Cir.1997)), the Fifth Amendment admits no such limitation (except in one narrow circumstance where the privilege against self-incrimination embedded in the *Miranda* warning is overcome by the public's interest in safety, *see New York v. Quarles,* 467 U.S. 649, 657–60, 104 S.Ct. 2626, 2632–34, 81 L.Ed.2d 550 (1984)). Indeed, the government's

### B. Waiver

■ The government contends that Russell waived the Fifth Amendment privilege when he failed to claim it at the time when he produced the subpoenaed documents. *See Rogers v. United States,* 340 U.S. 367, 370, 71 S.Ct. 438, 440, 95 L.Ed. 344 (1951) ("The privilege is deemed waived unless invoked."). The government's argument that the privilege may be waived by making a voluntary statement is not apposite to the issue before us, which concerns the evidentiary use of a response to a subpoena for the production of documents. While the Fifth Amendment is generally not self-executing, where a testimonial act is, as in this case, compelled, the defendant does not waive the privilege by failing to invoke it. *See Adams v. Maryland,* 347 U.S. 179, 179–83, 74 S.Ct. 442, 444–45, 98 L.Ed. 608 (1954) (holding the Fifth Amendment self-executing where testimony was compelled by a congressional grant of use immunity).

■ As with congressional testimony elicited pursuant to a summons that promises use immunity, *see id.,* a subpoena to the corporate custodian for corporate records cannot be refused. The personal privilege against being identified as the individual who complied with the subpoena is a " 'necessary concomitant' of the fact that a corporate, or government, custodian acts in a representative rather than a personal capacity." *United States v. Dean,* 989 F.2d 1205, 1210 (D.C.Cir.1993).[5]

### C. Harmless Error Analysis

■ The district court's erroneous admission of evidence concerning Russell's production of documents mandates reversal of his conviction unless it was "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The government bears the "burden of showing the absence of prejudice." *United States v. Olano,* 507 U.S. 725, 741, 113 S.Ct. 1770, 1781, 123 L.Ed.2d 508 (1993). Although the government did not argue harmless error, we have discretion to consider it. *United States v. Giovannetti,* 928 F.2d 225, 227 (7th Cir.1991); *see United States v. Rose,* 104 F.3d 1408, 1414 (1st Cir.) (adopting discretionary standard for overlooking government failure to raise harmlessness), *cert. denied,* —— U.S. ——, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997); *Horsley v. Alabama,* 45 F.3d 1486, 1492 n. 10 (11th Cir.1995) (same), *cert. denied,* —— U.S. ——, 116 S.Ct. 410, 133 L.Ed.2d 328 (1995); *United States v. Langston,* 970 F.2d 692, 704 n. 9 (10th Cir.1992) (same); *Lufkins v. Leapley,* 965 F.2d 1477, 1481 (8th Cir.1992) (same); *United States v. Pryce,* 938 F.2d 1343, 1348 (D.C.Cir.1991) (same).

In deciding whether to exercise that discretion,

> the controlling considerations are the length and complexity of the record, whether the harmlessness of the error or errors found is certain or debatable, and whether a reversal will result in protracted, costly, and ultimately futile proceedings in the district court.

*Giovannetti,* 928 F.2d at 227. Here the record is complex, and "[t]he certainty of harmlessness does not appear with such clarity from an unguided search of the record that we should raise the issue on our own motion." *Id.* Although a reversal may be costly, we must vacate Russell's convictions.

## II. ADEQUACY OF THE INDICTMENT

Mark McLaughlin complains that because the indictment charged him with evasion of payment of taxes rather than with evasion of assessment of taxes, *see* 26 U.S.C. § 7201,

---

exception would swallow the privilege in its entirety.

5. A statement voluntarily given to the government by a custodian may be admissible against him in a later criminal proceeding. *See United States v. Washington,* 431 U.S. 181, 186–87, 97 S.Ct. 1814, 1818–19, 52 L.Ed.2d 238 (1977). The government alleges that statements made by Russell in conjunction with his handing over

requested documents amounted to a voluntary statement and thereby waived all rights against self-incrimination described in *Braswell.* Review of the trial testimony belies the government's contention. The investigating officer conceded at trial that the meeting "was not an interview of Russell" and that Russell's only testimonial act was to produce a list of the documents that he had delivered.

there was a failure of proof at trial. Because the McLaughlins did not raise this claim before the district court, plain error analysis applies. Fed.R.Crim.P. 52(b). Section 7201 states, in relevant part: "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall ... be guilty of a felony...." 26 U.S.C. § 7201. Count Two of the indictment charged that the McLaughlins

> willfully attempted to evade and defeat the payment of a large part of the income tax due and owing by [BIU] ... by concealing and attempting to conceal from BIU's accountant and the Internal Revenue Service the nature and extent of BIU's income and the location thereof, and by making false statements to BIU's accountant with respect to the nature and extent of BIU's income.

Section 7201 includes two distinct offenses: evading assessment and evading payment. *Sansone v. United States,* 380 U.S. 343, 354, 85 S.Ct. 1004, 1011–12, 13 L.Ed.2d 882 (1965). These offenses require different elements of proof, *compare United States v. McGill,* 964 F.2d 222, 229 (3d Cir.1992) (listing elements of "evasion of payment") *with Cohen v. United States,* 297 F.2d 760, 770 (9th Cir.1962) (listing various means to evade assessment), but "they frequently overlap." *United States v. Mal,* 942 F.2d 682, 688 (9th Cir.1991); *see United States v. Dunkel,* 900 F.2d 105, 107 (7th Cir.1990) (stating that although "[s]ometimes it is convenient to say that different methods are different 'crimes' ... nothing in the text or history of § 7201 requires an indictment to treat § 7201 as if it were two sections of the United States Code"), *vacated on other grounds by* 498 U.S. 1043, 111 S.Ct. 747, 112 L.Ed.2d 768 (1991).

Had the government charged the McLaughlins with evasion of payment, it would have had to prove a valid assessment from which the McLaughlins hid assets. *United States v. England,* 347 F.2d 425, 430 (7th Cir.1965). The government did not prove that element. Thus, the conviction may stand only if the government's proof at trial did not amend the indictment and if the language of the indictment was sufficiently broad to put the McLaughlins on notice that the government would proceed under the evasion-of-assessment theory.

██ With respect to amendment of the indictment, two types of amendments are impermissible: "First, ... any amendment that transforms an indictment from one that does not state an offense into one that does ... [and second,] any charge that tends to increase the defendant's burden at trial." *United States v. Milestone,* 626 F.2d 264, 269 (3d Cir.1980). Despite its vagueness, the indictment clearly states an offense. And though the count may have been poorly articulated, it did not increase the McLaughlins' burden at trial. Thus, there was no impermissible amendment of the indictment.

██ We next consider whether there was a "variance [between the indictment and the crime proved] [that] actually prejudice[d] the defendant." *United States v. Somers,* 496 F.2d 723, 744 (3d Cir.1974). Variances "are examined on a case-by-case basis and constitute reversible error only if the defendant was prejudiced." *United States v. Smith,* 789 F.2d 196, 200 (3d Cir.1986). In this case, no prejudice occurred: (1) a reading of the entire indictment makes clear that the government intended to proceed on a theory of evasion of assessment; (2) Mark's own attorney addressed the evasion-of-assessment theory at trial; and (3) Count Two itself specified conduct relevant only to an evasion-of-assessment theory (e.g., concealing income from BIU's own accountants). As in *United States v. Waldeck,* 909 F.2d 555 (1st Cir.1990), "it was clear at the start of trial that the government was proceeding on an evasion-of-assessment theory." *Id.* at 558.

## III. FAILURE TO ISSUE SUMMONSES AND GIVE NOTICE UNDER 26 U.S.C. §§ 7602(a)(2), 7609(a)

██ The IRS interviewed BIU's former accountant and received records from him without first issuing a summons, *see* 26 U.S.C. § 7602(a), and giving the McLaughlins concomitant notice of its request for

records. *See* 26 U.S.C. § 7609(a). The McLaughlins' motion to suppress the evidence so obtained was denied by the district court. Mark McLaughlin contends that the IRS's failure to issue the summons and give notice violated 26 U.S.C. § 7609(a). Our review is plenary. *United States v. Emanuele,* 51 F.3d 1123, 1127 (3d Cir.1995).

If the IRS had issued a summons to a third-party record-keeper and the summons had "require[d] the production of any portion of records made or kept of the business transactions or affairs of" BIU, the McLaughlins would have been entitled to receive notice of the summons. 26 U.S.C. § 7609(a)(1). In this case, the IRS issued no summons and therefore gave no notice of the informal interview and voluntary document delivery. *See id.* (stating that notice is required "*[i]f* ... any summons ... is served...." (emphasis added)).

The IRS has broad discretion on how it conducts its investigations. *See* 26 U.S.C. § 7602. As the Ninth Circuit has said:

> Section 7602 provides three separate means of ... inquiry. Section 7602(a)(1) provides for an informal, noncompulsory means of inquiry. If an informal inquiry proves inadequate, Sections 7602(a)(2) and 7602(a)(3) provide mechanisms for the formal compulsion of the production of documents and testimony.

*Speck v. United States,* 59 F.3d 106, 108 (9th Cir.1995). "Nothing ... in the text of Section 7602 suggests that subsection (a)(2) should be read to exclude informal or non-coercive attempts to obtain information about possible failures to report income." *Id.* Section 7602(a) permits the government to conduct a formal investigation and issue summonses or to proceed informally. In this case, the government chose to proceed informally, and BIU's former accountant cooper-

ated with the investigation. It was entitled to do so without notifying Mark.

## IV. ADMONITION TO DEFENSE COUNSEL IN PRESENCE OF JURY

■ During the defense's recross of BIU's accountant, who appeared under government subpoena, the court interrupted and questioned the propriety of defense counsel's asking leading questions of the witness whom the McLaughlins were compensating for his time at trial. Defense counsel argued that the witness had been subpoenaed by the government and that his compensation was irrelevant. The judge later conceded that he had been rough with defense counsel and gave a curative instruction to the jury, in which he praised the integrity of counsel.[6] Mark now seeks a new trial on the ground that the district court's intervention in the questioning was reversible error.

Though the court's comments reflected unfavorably on defense counsel, the court did not "lose[ ] its color of neutrality [or] tend[ ] to accentuate and emphasize the prosecution's case." *United States v. Bland,* 697 F.2d 262, 265 (8th Cir.1983). The court's comments neither undermined the McLaughlins' defense nor buttressed the government's case. They at most implied frustration with the form of counsel's questions and some discomfort with the witness' relationship with defendants. The inferences that a jury could have drawn from the court's comments are not "of such a serious nature as to constitute reversible error, particularly in view of the court's [curative instruction]." *Sleek v. J.C. Penney Co.,* 324 F.2d 467, 477 (3d Cir.1963); *see United States v. Price,* 13 F.3d 711, 723 (3d Cir.1994); *United States v. Stayback,* 212 F.2d 313, 319 (3d Cir.1954).

---

**6.** The court gave the following curative instruction to the jury:

> [S]ome matters took place this morning and I perhaps got a little grumpy with counsel. I want to tell you that you in no way should draw any adverse inference against the lawyers or against the defendants in this case. I can

attest that these lawyers are all swell guys. I like them personally, and they are ethical as the day is long.

And you should not draw any adverse inference whatsoever. They are fine fellows and they are doing their jobs and they are doing it very

## V. SENTENCING GUIDELINE IS-SUES[7]

Mark McLaughlin was sentenced on the basis of an adjusted offense level of 17. The Pre–Sentence Report ("PSR"), which the court adopted, assigned Mark a base offense level of 15, *see* U.S. Sentencing Guidelines Manual § 2T1.1 (1988) ("U.S.S.G."), and recommended a two-point upward adjustment for obstruction of justice. *See* U.S.S.G. § 3C1.1. Mark appeals the sentence on three grounds: (1) the tax loss upon which he was sentenced was artificially inflated by including income on which taxes were already being paid; (2) the Sentencing Commission exceeded its authority by including interest in the computation of tax loss; and (3) the upward adjustment for obstruction of justice was not warranted. The district court rejected these arguments.

### A. *Determination of Loss Amount for Sentencing Purposes*

██ Mark McLaughlin contended at both trial and sentencing and argues again here that taxes were being paid on the income in the First Fidelity account and therefore that no tax loss was attributable to the income deposited in that account. The district court rejected the argument and at sentencing took into account all funds deposited in both the NJNB and First Fidelity bank accounts, which amounted to roughly $1,400,000 in income.

In his brief, Mark recites trial evidence bearing on the issue of whether the First Fidelity account was a reserve against future claims and argues that the jury may have rendered a verdict based solely on the nonreporting of the NJNB account. The jury returned a general verdict of guilty that does not distinguish between the accounts. *Cf. United States v. Bailin,* 977 F.2d 270, 282 (7th Cir.1992) ("When a case involves a general verdict, establishing that the verdict nec-

essarily determined any particular issue is extremely difficult.").

Where the jury does not determine the amount of tax evaded, the determination must be made by the trial judge. *United States v. Olbres,* 99 F.3d 28, 31 (1st Cir.1996). The district court received extensive briefing on the question of loss, conducted a hearing, and made a finding that:

> With respect to the accountability for the $770,000 [in the First Fidelity account], in my view, viewing the record as a whole, it clearly makes these defendants accountable for both of the accounts in the criminal context.[8]

We review the district court's determination of the amount of loss for clear error. *United States v. Colletti,* 984 F.2d 1339, 1345 (3d Cir.1992).

Mark contends that the First Fidelity account was a reserve against future warranty claims and that its balance therefore was being treated as accrued income over ten years. He claims that BIU or another McLaughlin-related affiliate has treated a prorated portion of the account as income on every return since 1988, before BIU was aware of the government investigation. The government argues in response that the McLaughlins' fraudulent activities extended to both accounts and that, even if the jury's verdict rested on only one account, the court could have considered fraudulent conduct with respect to the other as relevant conduct. *See* U.S.S.G. § 1B1.3(a). The government moreover points to evidence indicating that funds in the First Fidelity account were used to capitalize other ventures.

The record is complex and the facts were hotly disputed. On the record before us, we cannot say that the district court's finding was clearly erroneous.[9]

---

ably. A little matter came up and you shouldn't concern yourselves with that at all.

7. All parties agree that the 1988 Sentencing Guidelines apply.

8. The McLaughlins did not challenge the inclusion of the NJNB account in the calculation.

9. Mark also contests the inclusion of four smaller amounts totaling roughly $200,000 in the computation of tax loss. That argument was rejected by the district court in its disposition of this matter. The court's findings were not clearly erroneous.

## B. *Including Interest in Loss Amount*

▇ Mark contends that the Sentencing Commission exceeded its statutory authority when it included interest on unpaid taxes in the computation of tax loss. *See* U.S.S.G. § 2T1.1 app. n. 2. The provision in the Code that describes the authority of the Commission states that the Guidelines should "provid[e] certainty and fairness in sentencing and reduc[e] unwarranted sentence disparities." 28 U.S.C. § 994(f). Mark argues that including accumulated interest in the calculation of tax loss exacerbates sentencing disparities by causing defendants' sentences to depend largely on when the government brings its case (and therefore how much interest accumulates) rather than on the amount of income hidden from assessment.

Including interest in computing tax loss to the government merely recognizes the time value of money. Far from being beyond the Commission's authority, it is a rational calculation of the real loss sustained as a consequence of a taxpayer's illegally concealing his income from assessment. Whatever capacity the government has to affect the magnitude of a defendant's sentence by choosing strategically when to indict an allegedly wayward taxpayer, no allegation of any impropriety is made here. Furthermore, it is always within the taxpayer's power to pay the deficiency and to stop interest from accruing. In short, "we fail to see how th[e] general statutory provision, outlining the purpose of the guidelines, supports [Mark's] contention." *United States v. Sanchez*, 995 F.2d 468, 470 (3d Cir.1993).

## C. *Two-level Enhancement for Obstruction of Justice*

In imposing a two-level enhancement for obstruction of justice on the McLaughlins, the district court found:

> Finally, with respect to obstruction of justice, in addition to what was related to me as the taping and garnering of alleged evidence or effort so to do in preparation for the [pretrial] hearing ... it seems to me that was going mighty far stretching the envelope of advocacy, frankly, in an effort to come up with some evidence to try to derail this prosecution.

But looking at what the Government has said on pages 11 and 12 of its brief, which are clearly made out by the record and I find them to have factual basis, in my view, that does constitute going that extra step, which is required in the United States versus Dunnigan ... demonstrating a willful impediment, seeking to establish a willful impediment to obstruction of justice, or an attempt to do the same perjuriously.

For example, when Mark McLaughlin testified ... that, in order to add additional money to "the reserve," "we formed a bank account in South Jersey into which we deposited cash into that account." The defense concedes that the jury convicted the Defendants of failing to report this income....

We review the sufficiency of the district court's findings supporting the imposition of a sentence enhancement for clear error. *See U.S. v. Maurello*, 76 F.3d 1304, 1308 (3d Cir.1996) ("If a decision is 'essentially factual,' we apply a clearly erroneous standard.").

Section 3C1.1 of the Sentencing Guidelines authorizes a two level increase in the offense level "[i]f the defendant willfully obstructed or impeded ... the administration of justice during the investigation, prosecution or sentencing of the instant offense...." U.S.S.G. § 3C1.1. Application Note 3(a) lists as an example of conduct to which the enhancement applies "threatening, intimidating, or otherwise unlawfully influencing a ... witness ... directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 app. n. 3(a).

▇ The conduct to which the court referred in the first part of its findings, as described in the government's brief, consisted of the McLaughlins' sending investigators to obtain tape-recorded statements from witnesses in an effort to demonstrate that the investigating IRS agent had violated the McLaughlins' constitutional rights. The investigators evidently did not disclose their identities and made secret recordings of their interviews. While the secret tape-recording of statements by persons who concealed their identity may be prohibited under the laws of some states (as the district court observed), it does not amount to conduct encompassed

140

by the Application Note. There is no contention, nor any evidence, that the McLaughlins "threaten[ed], intimidat[ed] or otherwise unlawfully influenc[ed]" any witness or "attempt[ed] to do so." *See id.*

 The court's second ground for imposing the enhancement was that the McLaughlins gave perjured testimony. Application Note 3 includes perjury as one of the types of conduct for which the enhancement may be imposed. In *United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), the Court held that a finding of perjury for purposes of the guideline enhancement requires proof that false testimony was given "with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *Id.* at 94, 113 S.Ct. at 1116. The Court added:

> [A] district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice ... under the perjury definition ... set out [above].

*Id.* at 95, 113 S.Ct. at 1117. Here the district court based its finding principally on Mark's testimony that the First Fidelity account was a "reserve," i.e., one with respect to which he claimed income was accrued and taxes paid when earned.[10] Application Note 1 directs that the "alleged false testimony ... by the defendant ... be evaluated in a light most favorable to the defendant." U.S.S.G. § 3C1.1 app. n. 1. Relying on that note, we have held that this note requires that the sentencing court refrain from imposing a § 3C1.1 enhancement for giving perjurious testimony unless the government satisfies its burden of "clearly convinc[ing the court] that it is more likely than not that the defendant has been untruthful." *United States v. Arnold,* 106 F.3d 37, 44 (3d Cir.1997). Here, the court failed to hold the government to its burden of proof.

Even assuming that Mark's conviction for "willful evasion of tax" implies that the jury rejected all of Mark's explanations for the failure to declare either account's balance as income,[11] that alone would not be sufficient to support a finding that Mark testified "with the willful intent to provide false testimony." As we held in *United States v. Colletti,* 984 F.2d 1339 (3d Cir.1992):

> [I]n order to warrant the two point enhancement for obstruction of justice, the perjury of the defendant must not only be clearly established, and supported by evidence *other than the jury's having disbelieved him,* but also must be sufficiently far-reaching as to impose some incremental burdens upon the government, either in investigation or proof, which would not have been necessary but for the perjury.

984 F.2d at 1348 (emphasis added).

Accordingly, we conclude that imposition of the section 3C1.1 enhancement was clear error. We vacate Mark McLaughlin's sentence.

## VI. CONCLUSION

We VACATE Russell McLaughlin, Jr.'s convictions and REMAND for a new trial. We VACATE Mark McLaughlin's sentence and REMAND for resentencing consistent with this opinion.

BECKER, Circuit Judge, concurring.

This is a close and difficult case, with many complications. I believe that the result that Judge Schwarzer reaches is correct, but I write separately because I come to that result by a more tortuous route, which I feel compelled to explain. That explanation will also identify the many concerns I have about the law in this area, which I hope can be dealt with in future cases. These concerns arise, I hasten to add, not because of any deficiency in Judge Schwarzer's opinion but because of the tensions created by *Braswell*

10. The government in its brief referred to in the court's finding also mentions a statement made by the McLaughlins to the agent during the investigation claiming the account to be a reserve, testimony by Russell that he had told the agent an account was a warranty account, and testimony by him that he did not know BIU's 1988 return omitted substantial amounts of BIU income.

11. As we noted earlier, *see supra p.* 137, the jury's general verdict does not disclose whether the jury rejected all or only part of Mark's testimony.

*v. United States,* 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988) and the application of *Braswell* to cases that go beyond *Braswell*'s facts.

### I.

The Supreme Court held in *Braswell* that a corporate records custodian may not invoke his Fifth Amendment privilege against self-incrimination to resist a government summons or subpoena for corporate records even if the act of producing such records would relate information that would incriminate him. However, because the act of production is a corporate act, i.e., the custodian produces the documents as an agent for the corporation, the Court also held that the government may not use that act against the custodian in a prosecution against him personally.

In part I.A. of his opinion, Judge Schwarzer implicitly assumes that all acts of non-production related to a summons or subpoena are corporate acts, and that the government therefore cannot introduce evidence of this non-production against the custodian. I believe this to be an uncritical assumption. Whether an act of non-production is a corporate act turns on principles of agency law. A good faith decision by a records custodian to withhold documents he believes to be irrelevant to a summons or a subpoena is a corporate act. But, what if the custodian fails to turn over documents sought by the government because of gross negligence, deliberate indifference, or recklessness? Or, what if the custodian willfully and unlawfully chooses not to comply (as may well have happened here)? Are these acts of non-production within the custodian's agency? Hornbook agency law answers these questions with a "maybe." *See* Restatement (Second) of Agency § 34 cmt. g (1957) ("Authority to do illegal or tortious acts, whether or not criminal, is not readily inferred.").[1] In short, it is not clear to me that a records custodian will always be acting in his representative capacity when he fails to respond to a summons or a subpoena.

In this case, at least as I understand the record, there were no findings in the district court with respect to whether Russell McLaughlin, Jr. acted within his agency when he failed to comply adequately with the relevant IRS summons. I suppose, however, that such agency could be inferred. Building Inspections Underwriters, Inc. ("BIU") and its closely related businesses were owned and operated by the McLaughlin family, three of whom were indicted for tax evasion. It would not be unreasonable to conclude that the corporation as an entity directed its agent Russell McLaughlin, Jr., the President of the company, to withhold certain documents. However, it would seem inappropriate for us to draw that inference on this record without further investigation into the governing structure of the interlocking companies. In other words, under straightforward application of principles of hornbook agency law, we cannot now say for certain that McLaughlin acted within his agency. To conclude that McLaughlin acted within his agency (as I ultimately do), we must therefore look beyond hornbook agency law.

If McLaughlin acted outside his agency, then the *Braswell* protections likely do not apply. *See Braswell,* 487 U.S. at 118 n. 11, 108 S.Ct. at 2295 n. 11 ("[T]he limitation [against introducing the act of production against a custodian personally] is a necessary concomitant of the notion that a corporate custodian acts as an agent and not an individual when he produces corporate records in response to a subpoena addressed to him in his representative capacity."). Still, the government may be prohibited from introducing his act of non-production at a prosecution against him. For, if McLaughlin acted in his personal capacity and does not enjoy the protections afforded by *Braswell,* he may nevertheless enjoy a Fifth Amendment privilege against the compelled, incriminating testimony effected by the summons, if the elements of a privilege claim are met.

The elements of compulsion were arguably present here, for the summons or subpoena itself compelled McLaughlin not only to turn

---

1. A further potential complication is determining whether state or federal common law applies to define the scope of the agency, and, if state law applies (which I suspect it does), determining which state law to apply.

over records, but also to exercise his discretion as to whether certain documents fall within the scope of the summons or subpoena. Subject to the reservations set forth in the margin, I reason that he was therefore compelled to make a choice.[2]

Whether an act is testimonial and incriminating depends on the facts of a given case. *See Fisher v. United States*, 425 U.S. 391, 410, 96 S.Ct. 1569, 1580–81, 48 L.Ed.2d 39 (1976). There are a number of potential testimonial aspects of an act of production. Those aspects include the following: that the records produced existed; that the custodian had possession and control over the records; that the custodian believed the records to be subject to the subpoena or summons; and that the records are authentic. An act of non-production similarly has numerous testimonial aspects, including the following: that the documents requested do not exist; that the custodian did not possess or control the documents; that the custodian did not believe the documents to be subject to the subpoena or summons; and that the custodian believed that the withheld documents were relevant and that their contents or the act of producing them were incriminating.

In this case, the very act of non-production—the result of the compelled choice—related certain information. *See Doe v. United States*, 487 U.S. 201, 211, 108 S.Ct. 2341, 2348, 101 L.Ed.2d 184 (1988). That McLaughlin failed to comply fully with the summons arguably implied that he believed that the withheld documents were relevant and that their contents or the act of producing them were incriminating. That failure

may have further implied that McLaughlin had earlier willfully failed to report the contents of the documents (income from BIU) to the IRS. The government used these implications against McLaughlin at trial, arguing that the non-production of the documents evidenced McLaughlin's intent to evade federal taxes. The act of non-production, then, appears to have been incriminating. Thus, in this case, even if McLaughlin were not acting within his agency, I believe that the government could not use his act of non-production against him because to do so would have violated his Fifth Amendment rights. But, if we so hold, would we be undermining *Braswell* by permitting a non-producing custodian to claim his Fifth Amendment rights?

## II.

It is at this point that the complexities and problems of the case begin to crystallize. Going forward, how are we to apply this case and *Braswell* to future Russell McLaughlins? Assume that a grand jury issues a subpoena to a records custodian (as happened in *Braswell*). He refuses to comply, and seeks to quash the subpoena, invoking his Fifth Amendment privileges. The government opposes the motion to quash. What is the court to do? As a first step, the court should determine whether *Braswell* applies and prohibits the custodian from invoking his personal Fifth Amendment rights. But that would require the court to determine whether the custodian planned to act outside the scope of his agency in responding to the subpoena. Such a question could effectively require the custodian to imply that he in-

2. It is not entirely clear that a records custodian who inadequately complies with a summons or subpoena has been compelled, and, of course, if there is no compulsion, then the act of non-production could be introduced against the custodian (assuming that act was outside the scope of his agency). There are at least two ways of describing the factual scenario in such a way as to conclude that there is no compulsion (neither of which is wholly satisfying). First, it could be said that any compulsion is directed at the corporation or at least at an individual in his representative capacity, not the individual in his personal capacity. Although I am unaware of any discussion on this precise point, the Supreme Court, in cases such as *Braswell*, has focused on the testimonial aspects of a records custodian's produc-

ing records. It seems to have assumed that personal compulsion is present; otherwise, it would not have needed to create evidentiary limitations on introducing the act of production because there would be no concerns at all about violating the individual's Fifth Amendment privileges. Second, it could be said that the government did not compel the act of *non*-production, but only the act of production; at least in the case of the custodian who acted willfully, he may be said to have voluntarily chosen to disregard the summons or subpoena. Yet that voluntary act of non-compliance occurred only after the government compelled the custodian to engage in the decisional process in the first place. *See infra*.

tends to act unlawfully by withholding relevant documents. As a condition of claiming his privilege against self-incrimination, then, the custodian would need to incriminate himself. Perhaps the court could prohibit the government from using that admission against the custodian at some future prosecution, but this prohibition further complicates an already complicated problem.

Even undertaking an analysis as to whether *Braswell* applies may undermine it. By undertaking such an analysis, the court might signal to the custodian that there is a way around *Braswell*, and a way around complying with the subpoena. If the custodian knows that compliance with the subpoena would force him to turn over documents the contents of which are personally incriminating or the act of production of which is personally incriminating, then he may claim that he plans to act outside his agency when he responds to the subpoena (and risk that his admission might lead to or support some future prosecution). In that case, a devious custodian can invoke his Fifth Amendment privilege and resist the subpoena, the very outcome *Braswell* sought to avoid.

As suggested above, the court might attempt to limit the use of the results of complying with the subpoena, i.e., the act of production or non-production, to ensure that any testimonial aspects of being compelled to respond to the subpoena are not used to incriminate. Under *United States v. Doe*, 465 U.S. 605, 616–17, 104 S.Ct. 1237, 1244–45, 79 L.Ed.2d 552 (1984), the court cannot by itself prospectively limit the use of testimonial acts that have been compelled. The court can, however, suggest that if the government wants to compel a response to the subpoena that might be testimonial it must do so by resort to a statutory grant of use immunity pursuant to 18 U.S.C. §§ 6002 and 6003. But, such a suggestion violates at least the spirit of *Braswell*. The Court in *Braswell* strove mightily to ensure that the government could compel a records custodian to comply with a subpoena without first providing him statutory use immunity, an immunity that could stymie any prosecution directed at him.[3]

The only way to avoid this morass altogether, at least as I see it, is to assume in all cases (as Judge Schwarzer seems to do) that a records custodian will always act within his agency when he responds to a government subpoena or summons. Working from that assumption, this case and our hypothetical case are easy; under *Braswell*, neither McLaughlin nor our hypothetical records custodian can invoke his personal Fifth Amendment rights to resist a summons or a subpoena served on the entity he represents, but the government cannot use any act of production or non-production in a prosecution against him. However, as I noted above, I believe that such an assumption stretches hornbook agency law. I am willing to accept such a stretch because the alternative is to undermine either *Braswell* or Fifth Amendment jurisprudence more generally. However, I think that the problems that I have identified need exploration in future cases.

Whichever way the pie is sliced here, I believe that the use of McLaughlin's act of non-production against him personally would be unlawful. I therefore join Judge Schwarzer's opinion.

---

3. The court might also choose to appoint an alternate custodian (for example, outside legal counsel) to respond to the subpoena. *Braswell* strongly discourages this course. How, the Supreme Court asks, is an alternate custodian, unfamiliar with the record-keeping machinery of the entity, to respond adequately to a subpoena? The Court assumes, correctly I believe, that resort to an alternate custodian all but ensures that the entity will not turn over the documents the government seeks.