

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-6-1998

# USA v. Fiorelli

Precedential or Non-Precedential:

Docket 94-2210

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"USA v. Fiorelli" (1998). *1998 Decisions.* Paper 1.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/1

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 6, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 94-2210

UNITED STATES OF AMERICA

v.

JOSEPH FIORELLI
Appellant

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Crim. Action No. 94-cr-00146)

Argued October 14, 1997

BEFORE: STAPLETON, ALITO and ROSENN,
Circuit Judges

(Opinion Filed January 6, 1998)

      Michael R. Stiles
      U.S. Attorney
      Robert E. Courtney III
      Deputy U.S. Attorney
      Walter S. Batty, Jr.
      Assistant U.S. Attorney
      Robert K. Gordon (Argued)
      Assistant U.S. Attorney
      Office of U.S. Attorney
      615 Chestnut Street
      Philadelphia, PA 19106
       Attorneys for Appellee

          Barnaby C. Wittels (Argued)
          Stephen R. LaCheen & Associates
          225 South 15th Street
          3100 Lewis Tower Building
          Philadelphia, PA 19102
           Attorney for Appellant

OPINION OF THE COURT

STAPLETON, Circuit Judge:

This is an appeal by Joseph Fiorelli from a final judgment of conviction and sentence following a criminal jury trial in the United States District Court for the Eastern District of Pennsylvania. We will vacate Fiorelli's sentence and remand for resentencing.

I.

From 1967 to 1991, Fiorelli was employed as the business representative of Drywall Finishers Local Union 1955 of the International Brotherhood of Painters and Allied Trades. Fiorelli also served as a trustee for the Local 1955 Health and Welfare Fund and several other union benefit funds. As business representative, Fiorelli was responsible for overseeing the daily operation of the union, whose members were employed by contractors and construction companies engaged in drywall finishing. The job of a drywall finisher is to complete the installation of drywall in a residential or commercial building using tape and joint compound.

A federal grand jury returned a 15-count indictment against Fiorelli, charging him with demanding and accepting illegal payments and gifts from contractors during his service as business representative. After trial, a petit jury found Fiorelli guilty of most of the counts in the indictment, including racketeering, conspiracy to violate the Taft-Hartley Act, unlawful request and receipt of money by a union official, extortion, embezzlement, and obstruction of justice. The jury also ordered forfeiture of $68,984 in racketeering proceeds. The district court sentenced Fiorelli

to 121 months of imprisonment, followed by three years of supervised release, a fine of $12,500, and special assessments totaling $600. This appeal followed.

The government's case at trial consisted of a parade of builders and contractors who testified that they made periodic payments to Fiorelli or to James Siesser, his associate, on Fiorelli's behalf. These payments were made, for the most part, because the witnesses believed it was in their economic interest to do so. Some said they wanted to assure themselves of a good supply of qualified union workers or to avoid trouble over their having used non-union workers. Others paid because they believed the payments would guarantee labor peace and acceptable contracts. These witnesses did not report express threats of violence or economic harm but indicated that, based on their contact with Fiorelli and Siesser, they feared labor trouble if they did not pay.

One witness, William Sampsel, testified that, upon arriving in Philadelphia to oversee his firm's execution of a contract to do the drywall work in a 19-story building, Fiorelli demanded $38,000 in return for assuring that he would have a supply of good workers. Siesser visited the job site a number of times to pressure Sampsel and ultimately threatened him with bodily harm if he reported Fiorelli's demands to the FBI. The government did not contend that Fiorelli ever obtained money or anything else of value from Sampsel.

Fiorelli testified in his own behalf. He admitted that he received payments that he regarded as Christmas gifts and vacation money from contractors and builders who thought well of him and wanted to give him what he called "tips." He insisted, however, that he had never threatened violence or economic harm to any of the builder/contractor witnesses. He also specifically denied ever asking Sampsel for money.

The record affirmatively reflects that the district court considered Fiorelli's written objections to the presentence report and that it afforded counsel ample opportunity at two sentencing hearings to address those objections and any other he wished to make. Ultimately, the court, with

3

one exception not here relevant, adopted the factual findings and guideline application set forth in that report. In accordance with the adopted guideline application, the court grouped the offenses in ten groups. Each extortion offense against a particular victim was placed in a separate group. The obstruction of justice offense, which related to an effort by Fiorelli to cover up his embezzlement of union funds to pay personal dental expenses, was not placed in a separate group but served as the basis for an enhancement of the offense level for the underlying embezzlement. After applying the multiple-count adjustment of U.S.S.G. S 3D1.4, the court determined that 27, the base offense level for group seven, was the "greater adjusted offense level." Adding five levels under U.S.S.G. S 3D1.4, reflecting the groups of offenses, the district court concluded that the combined adjusted offense level was 32 and that the guideline range for imprisonment is 121 months to 151 months.

Fiorelli, in addition to challenging the presentence report in a number of respects, moved for a downward departure based on extraordinary family circumstances. This motion was premised on the fact that Fiorelli played an important role in the life of his granddaughter who suffers from cerebral palsy. The district court heard extensive evidence in support of this motion, but ultimately exercised its discretion to deny it.

II.

Since it is clear that the district court recognized that it had discretion to depart downward on the basis of extraordinary circumstances, we have no jurisdiction to review its decision not to depart. See United States v. Denardi, 892 F.2d 269, 272 (3d Cir. 1989). Accordingly, we turn to Fiorelli's challenges to the district court's calculation of the guideline range. All, save one, of those challenges present no substantial issue.

First, Fiorelli contests the district court's failure to group the extortion offenses. He insists that they must be grouped together because they were all alleged in the RICO count to be part of a pattern of racketeering activity. U.S.S.G.

4

S 3D1.2 provides the governing rules regarding grouping, however, and where the offenses involved are extortion offenses, there are different victims, and no count involves conduct that is treated as a specific offense characteristic in, or adjunct to, the guideline for another count, S 3D1.2 does not authorize grouping. The fact that the extortions are a part of a pattern of racketeering activity is simply irrelevant to the grouping issue under these circumstances.

Turning to the crucial calculation of the offense level for group seven, Fiorelli asserts that the district court made no findings to support its specific offense characteristic enhancement under U.S.S.G. S 2B3.2(b)(1) for threatening bodily injury, its role in the offense adjustment under U.S.S.G. S 3B1.1(c) for being an organizer and supervisor, or its role in the offense adjustment for abusing a position of trust under U.S.S.G. S 3B1.3. This is simply not the case. The district court adopted express findings (1) that "Sampsel threatened to go to the FBI and Siesser, under Fiorelli's direction, threatened bodily injury and death if Sampsel went to the FBI" (PSR at 24); (2) that "Fiorelli recruited and supervised James Siesser" (PSR at 25); and (3) that "Fiorelli was the business manager of Local 1955 and in that position he was afforded substantial judgment that is ordinarily given considerable deference . . . and [he] used this position to coerce and extort money from contractors" (PSR at 25). None of these findings is clearly erroneous. Moreover, Fiorelli is also in error in arguing that "abuse of trust is an element inherent in the offense extortion" so that an adjustment for such abuse would somehow amount to double counting.

III.

A more serious issue is presented by the district court's two level adjustment of the offense level of group seven for an obstruction of justice through perjured testimony at trial.

A. The Controlling Law

An adjustment is authorized by U.S.S.G. S 3C1.1 "[i]f the defendant willfully obstructed or impeded, or attempted to

5

obstruct or impede, the administration of justice during the
investigation, prosecution, or sentencing of the instant
offense." Perjurious testimony by a defendant at trial can
clearly constitute such an obstruction of justice.
Application Note 3(b); United States v. Dunnigan, 507 U.S.
87 (1993).

At the time of Fiorelli's crime and at the time of his
sentencing, Application Note 1 to S 3C1.1 read, in relevant
part, as follows:[1]

> This provision is not intended to punish a defendant
> for the exercise of a constitutional right. A defendant's
> denial of guilt (other than a denial of guilt under oath
> that constitutes perjury) . . . is not a basis for
> application of this provision. In applying this provision
> in respect to alleged false testimony or statements by
> the defendant, such testimony or statements should be
> evaluated in a light most favorable to the defendant.

The Supreme Court and this court have provided a gloss
on S 3C1.1 that is helpful here. We begin with United States
v. Dunnigan, 507 U.S. 87 (1993). The Court there held that
"the Constitution permits a court to enhance a defendant's
sentence under [S 3C1.1] if the court finds the defendant
committed perjury at trial." Id. at 88-89. Because fear of an
unjustified enhancement may chill exercise of the
defendant's constitutional right to testify in his own
defense, however, there was an important caveat to this
holding: "the trial court must make findings to support all
the elements of a perjury violation in the specific case," id.
at 97, that is, factual findings that the defendant (1) gave
false testimony (2) concerning a material matter (3) with the
willful intent to provide false testimony. Id. at 94.

We first had occasion to apply the teachings of Dunnigan
in United States v. Boggi, 74 F.3d 470 (3d Cir. 1996). We
there held that "express separate findings are not required"
under Dunnigan. Id. at 479. We explained that where "the
record establishes that the district court's application of the
enhancement necessarily included a finding as to the

_____

1. This segment of Application Note 1 was amended, effective November
1, 1997. See footnote 3, infra.

6

elements of perjury, and those findings are supported by the record, we will not remand merely because the district court failed to engage in a ritualistic exercise and state the obvious for the record." Id.

Boggi, like Fiorelli, was a union official who had been found guilty of extorting money and services from contractors. When reviewing the perjury enhancement imposed by the district court under S 3C1.1, we stressed that the record reflected that Boggi took the stand in his own defense and specifically denied receiving anything of value from each of the contractors named in the indictment. Id. at 478-79.2 The district court, at sentencing,

_____

2. The colloquy we cited in support of this proposition as follows:

Q. Okay, Mr. Boggi, you've been charged with accepting money from Mr. and Mrs. Magac. Did you ever accept any money from Mr. and Mrs. Magac?

A. No, I did not.

Q. You've been charged with accepting money from Mr. Meister or Philmont Contractors. Did you ever accept any money from him or them or it?

A. No, I did not.

Q. You've been charged with accepting money from Samuel Kaufman, Inc. Did you ever accept any money from Mr. Kaufman or his corporation?

A. No, I did not.

Q. You've been charged with accepting money from Stuart Gray or Denver Drywall Company, Inc. Did you ever accept any money from it or him?

A. No, I did not.

Q. You've been charged with accepting kitchen cabinets from Calvanese Corporation, CGC Corporation -- CJC Corporation, excuse me, or Carmen Calvanese. Did you ever accept as a gift any kitchen cabinets from Mr. Calvanese, from Calvanese Corporation or from CJC Construction Company?

A. No, sir.

Q. You've been charged with accepting a gift of two tickets to the Super Bowl from 1990 from Mr. Wyatt. Did you receive the two ticket -- two Super Bowl tickets from Mr. Wyatt?

recognized that " `a guilty verdict . . . binds the sentencing court to accept the facts necessarily implicit in the verdict.' " Id. at 478-79 (quoting United States v. Weston, 960 F.2d 212, 218 (1st Cir. 1992)). It understandably concluded: "I don't see how, in view of his flat denials and the jury's conviction, that you can find otherwise than that he testified falsely on the stand." Id. at 478. Given that receipt of something of value was an essential element of the charges against Boggi, his testimony on this issue "was necessarily material" as a matter of law. Id. at 479. Moreover, given his specific and unambiguous "flat denials" concerning an issue that was the central focus of the trial, the record provided ample assurance "that Boggi provided false testimony with willful intent, `rather than as a result of confusion, mistaken or faulty memory.' " Id. at 479 (quoting Dunnigan, 507 U.S. at 94). Thus, while there were no express findings of the district court in Boggi on materiality and willfulness, "the record establishe[d] that [its] application of the enhancement necessarily included a finding as to the elements of perjury." Id.

In United States v. Arnold, 106 F.3d 37 (3d Cir. 1997), we turned our attention to Application Note 1 to S 3C1.1. There, the district court had made a finding that specific testimony of the defendant going to a critical issue at his trial had been willfully false. The defendant insisted on appeal, however, that S 3C1.1 and Application Note 1 required the government to prove each of the elements of perjury by "a higher standard than a preponderance of the evidence." Id. at 44. We agreed and found it necessary to remand for resentencing because there was "no indication in the record that the district judge . . . placed the burden of proof upon the government and viewed the evidence in the light most favorable to Arnold." Id. We instructed that

---

A. Yes, I did.

Q. Mr. Boggi, did you ever accept any money from any contractor with whom you had dealings as a union representative?

A. No, I did not.

Boggi, App. at 1118-19.

8

"[o]n remand, the district court must use the clear and convincing standard, place the burden of proof upon the government, and support its decision with the findings required by the Supreme Court's decision in Dunnigan." Id.3

Since Arnold, we added further to our gloss on S 3C1.1 in

_____

3. Application Note 1 was amended, effective November 1, 1997, to substitute the following for the concluding sentence quoted above in the text:

> In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

The Sentencing Commission adopted this change so that the Application Note "no longer suggests the use of a heightened standard of proof. Instead, it clarifies that the court should be mindful that not all inaccurate testimony or statements reflect a willful attempt to obstruct justice." U.S.S.G. Appendix C, Amendment 566 (1997).

Although the eliminated sentence can accurately be described as ambiguous with respect to whether a clear and convincing standard is required and although the Commission's explanation for its amendment uses the word "clarifies," this is not a situation in which the Commission has amended an application note to resolve an ambiguity by explaining what the intent behind the ambiguous provision was. The Commission's explanation acknowledges that the concluding sentence of the prior version, which originated in 1990, suggested a standard higher than a preponderance of the evidence and indicates that it was stricken to eliminate that suggestion for the future. Moreover, it is clear from a comparison of the texts of the new sentence and the stricken one that the new sentence was not intended to set forth the intended meaning of the stricken one. Rather, the new sentence is intended to clarify the intended application of the guideline and the application notes by calling attention to the 1993 teachings of the Supreme Court in United States v. Dunnigan, 507 U.S. 87 (1993). Accordingly, this is not a situation in which we, as a panel, are free to reexamine our decision in United States v. Arnold, 106 F.3d 37 (3d Cir. 1997), in light of the subsequent amendment to Application Note 1. Cf. United States v. Joshua, 976 F.2d 844 (3d Cir. 1992). The 1990 version of Application Note 1 is applicable here, and we are bound by its interpretation in Arnold. See United States v. Bertoli, 40 F.3d 1384 (3d Cir. 1994); United States v. Menon, 24 F.3d 550 (3d Cir. 1994).

9

United States v. McLaughlin, 126 F.3d 130 (3d Cir. 1997). McLaughlin was convicted of income tax evasion. At trial, he testified that a particular bank account was a reserve against future warranty claims and that its balance therefore was being treated as accrued income over a ten year period. As a result, McLaughlin contended that there was no tax loss attributable to the income deposited in that account.

At the sentencing hearing in McLaughlin, the district court imposed a S 3C1.1 enhancement. It concluded in conclusory fashion that McLaughlin was guilty of "a willful impediment to obstruction of justice." Id. at 139. It then gave the following, sole example:

> For example, . . . Mark McLaughlin testified . . . that, in order to add additional money to "the reserve," "we formed a bank account in South Jersey into which we deposited cash into that account." The defense concedes that the jury convicted the Defendants of failing to report this income . . . .

Id.

We held that the enhancement was "clear error." Id. at 140. We first noted that the jury had "returned a general verdict of guilty that [did] not distinguish between the [various] accounts." Id. at 138. It thus did "not disclose whether the jury rejected all or only part of Mark's testimony." Id. at 140 n.11. Accordingly, the falsity of McLaughlin's testimony regarding the First Fidelity account was not necessarily implicit in the verdict.

We went on to point out that even if the falsity of this testimony had been necessarily inherent in the jury's verdict, "the jury's having disbelieved him" would not "alone . . . support a finding that Mark testified `with the willful intent to provide false testimony.' " Id. at 140 (emphasis supplied). The record did not contain evidence from which a conclusion of willfulness was unavoidable and the district court provided no explanation as to whether or why it had become clearly convinced that the referenced testimony was willfully false. Accordingly, we held that the district court had "failed to hold the government to [the clear and

10

convincing] burden of proof" standard required by Arnold.
Id.

In the course of making the point that a jury finding of falsity does not necessarily mean there has been perjury, we quoted from our pre-Dunnigan decision in United States v. Colletti, 984 F.2d 1339 (3d Cir. 1992). We italicized the portion of the quoted sentence which supported that point. Another portion of that sentence repeated dicta from Colletti to the effect that the government must prove not only perjury to support a S 3C1.1 adjustment but also that the perjury was so "far-reaching as to impose some incremental burdens upon the government." 126 F.3d at 140. Fiorelli points to this portion of McLaughlin in support of his argument that the government's case here was deficient. We decline to recognize this requirement as part of the law of our circuit.

The quotation in McLaughlin regarding the necessity of an "incremental burden" was dicta in that case as well as in Colletti. Our confidence that it was not advanced by the McLaughlin court as a basis for the conclusion reached comes not only from the text of the opinion but also from the fact that such a holding would have been clearly inconsistent with the application notes and the decision of the Supreme Court in Dunnigan. At the time McLaughlin was decided, and at the time of Fiorelli's sentencing, as is true today, Application Note 3(b) expressly stated that "committing . . . perjury" was "conduct to which this enhancement applies." The Supreme Court took note of this fact in Dunnigan. It then went on to observe:

> Were we to have the question before us without reference to this commentary, we would have to acknowledge that some of our precedents do not interpret perjury to constitute an obstruction of justice unless the perjury is part of some greater design to interfere with judicial proceedings.

Dunnigan, 507 U.S. at 93. The Supreme Court concluded, however, that a construction of S 3C1.1 that would require more than proof of the existence of perjury would be "inconsistent with its accompanying commentary." Id. at 94.4 Thus, even if our statement in Colletti had not been dicta,

_____

4. We note, as well, that in sharp contrast to Application Note 3(b), Application Note 3(g) requires that a materially false statement to a law enforcement officer must significantly obstruct or impede the official investigation before a S 3C1.1 enhancement is appropriate.

11

its vitality would not have survived Dunnigan.

B. Application

Application of these governing principles to the record in this case involves a close judgment call. The only relevant comments of the district court are cryptic. At the same time, however, the record bears strong evidence that would support a finding of perjury in connection with the offenses in group seven. Ultimately, we conclude that this case is more like McLaughlin than Boggi, and out of an abundance of caution, decide to remand to provide an opportunity for the district court to make its views clear.

Fiorelli's Presentence Report, in explaining its recommended S 3C1.1 enhancement to the group seven offense level, states that "Fiorelli obstructed justice by perjuring himself repeatedly on the stand." PSR at 25. In response to Fiorelli's objection, the presentence officer added, "Defense counsel admitted that Fiorelli denied extorting money or services and that the jury did not accept Fiorelli's denial. This constitutes perjury under United States v. Dunnigan." PSR Addendum at 2. These statements of the probation officer were directed not only to group seven but to each group of offenses that included an extortion charge. In addition to adopting the presentence report, the district court quoted this response to Fiorelli's objection at the sentencing hearing and indicated that it was "persuaded by the statement of the Probation Officer." It then overruled the objection. There are no other relevant findings in the record.

Two racketeering acts of Fiorelli have been grouped in group seven. The jury found that the government had proved both beyond a reasonable doubt. The first was to demand $38,000 from William Sampsel and his firm, Alpha Painting and Restorations, Inc., while serving as a representative of one or more of its employees in violation of 29 U.S.C. S 186. The second of these racketeering activities was attempting to obtain $38,000 from Alpha "by wrongful use of . . . threatened force, violence and fear, including fear of economic harm" in violation of 18 U.S.C. S 1951. As we have earlier noted, Fiorelli took the stand

12

and specifically denied ever asking William Sampsel for money. The fact that he did so ask is necessarily inherent in the jury's verdict on both of these racketeering acts. Accordingly, if there were some record indication that the district court relied on Fiorelli's testimony that he had never asked Sampsel for money, this case would be indistinguishable from Boggi. Since a finding that this testimony was false was implicit in the verdict, that verdict would establish that falsity had been proven by more than clear and convincing evidence. Moreover, as in Boggi, the conclusion would be inescapable in the context of the charges being defended against and the unambiguity of Fiorelli's denial that this falsehood was deliberate, rather than the result of confusion, mistake, or lapse of memory. Finally, as in Boggi, the jury's verdict and the record would permit us to say with confidence that the government carried its heavy burden in proving all of the elements of perjury.[5]

The difficulty from the government's point of view arises from the fact that neither the presentence report nor the district court at the sentencing hearing focused on Fiorelli's denial of a request of money from Sampsel or, indeed, on the particular allegations, testimony, or verdict with respect to the group seven offenses. To the extent there was any focus on the perjury issue, it was not on Fiorelli's having denied requesting money from Sampsel, but rather on his having denied obtaining money and services from others by extortionate means. This fact changes our analysis because, as we have noted, Fiorelli freely acknowledged receiving money and services from contractors and builders other than Sampsel. He denied only making threats or promises in connection with his receiving those funds and services. Moreover, as we have also noted, the testimony of the builder/contractors was not that Fiorelli made explicit threats but rather that they interpreted his conduct to imply that there was cause for fear if they did not pay.[6]

_____

5. Judge Rosenn believes this case is indistinguishable from Boggi. He would therefore affirm the judgment of conviction and the sentence as is.

6. While Sampsel testified to an express threat of bodily injury, that threat was in connection with a demand by Siesser that Sampsel not go to the FBI, rather than in connection with the demand for $38,000.

13

The operative portions of the extortion allegations of the indictment are that the specified payments were made "with the consent of the contractors having been induced by the wrongful use of . . . fear, including fear of economic harm." See Gov't App. at 14. In a labor racketeering case involving similar allegations and a denial by the defendant that any threats were made, the Court of Appeals for the Fourth Circuit upheld the conviction, ruling as follows:

> The fear need not be the consequence of a direct or implicit threat by the defendant, and the government's burden of proof is satisfied if it shows that the victim feared an economic harm, and that the circumstances surrounding the alleged extortionate conduct rendered that fear reasonable. . . .
>
> [S]o long as the defendant intends to exploit the reasonable fear of the victim, his actions will constitute extortion under the Hobbs Act.

United States v. Billups, 692 F.2d 320, 330-31 (4th Cir. 1982) (citations omitted).[7]

Given the concerns reflected in Dunnigan's requirement of findings, if a sentencing court is going to rely on the verdict of the jury as laying part of the foundation for a S 3C1.1 enhancement, there should be no question but that the relevant finding was necessarily made by the jury. In this context, we are hesitant to conclude that the falsity of Fiorelli's testimony about the absence of any threats by him is necessarily inherent in the jury's verdict on the extortion charges. Moreover, we find inadequate other assurance in the record that the district court, in reaching its decision on the S 3C1.1 enhancement, held the government to its heavy burden of proving falsity and willfulness by clear and convincing evidence as required by Arnold.

IV.

We will reverse the judgment of the district court and remand for resentencing only. On remand, the district court

_____

7. See also United States v. Williams, 952 F.2d 1504, 1513 (6th Cir. 1991) (collecting cases).

14

should determine whether the government met its burden of proving each of the elements of perjury as set forth above and should make appropriate specific findings to reflect its decision. We do not foreclose the district court from imposing a S 3C1.1 perjury enhancement provided it does so in a manner consistent with this opinion.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

15